[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12357
_____

D.C. Docket No. 2:13-cv-02136-WMA

BLACK WARRIOR RIVERKEEPER, INC.,
DEFENDERS OF WILDLIFE,

Plaintiffs - Appellants,

versus

U.S. ARMY CORPS OF ENGINEERS,
LT. GENERAL THOMAS P. BOSTICK,
U.S. Army Corps of Engineers,
COL. JON CHYTKA,
U.S. Army Corps of Engineers, Mobile District,

Defendants - Appellees,

ALABAMA COAL ASSOCIATION,
MS&R EQUIPMENT CO., INC.,
REED MINERALS, INC., et al.,

Intervenors - Appellees.
_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(March 23, 2015)

Before HULL and MARCUS, Circuit Judges, and TOTENBERG,[*] District Judge.

MARCUS, Circuit Judge:

In this complex environmental case, plaintiffs Black Warrior Riverkeeper and Defenders of Wildlife appeal from the district court's grant of final summary judgment to the U.S. Army Corps of Engineers, as well as to the Alabama Coal Association and several mining companies, which intervened in the proceedings below.[1] Riverkeeper challenges the 2012 version of Nationwide Permit 21 ("NWP 21"), a general permit that allows surface coal mining operations to discharge dredged or fill materials into navigable waters. Riverkeeper essentially argues that the Corps arbitrarily and capriciously found that NWP 21 would have no more than minimal environmental effects, in violation of both the Clean Water Act and the National Environmental Policy Act.

The district court first determined that Riverkeeper has standing to sue in federal court because its members suffered injury as a result of the Corps' decision to enact NWP 21. We agree that Riverkeeper has standing, and so affirm the district court's decision on this point. The district court also held that Riverkeeper's lawsuit was, nonetheless, barred by the equitable doctrine of laches.

---

[*] Honorable Amy Totenberg, United States District Judge for the Northern District of Georgia, sitting by designation.

[1] For simplicity's sake, we will use "Riverkeeper" to refer to both plaintiff organizations, "the Corps" for the U.S. Army Corps of Engineers, and "the Intervenors" for the Alabama Coal Association and mining companies.

After thorough review, however, we conclude that the Intervenors have shown neither inexcusable delay on the part of Riverkeeper nor prejudice resulting from Riverkeeper's alleged delay. To the extent that Riverkeeper lagged in filing suit, its delay was slight and excused by its need to adequately investigate and prepare its claims in this complex case. Moreover, the Intervenors' modest showing of harm, stated only at the highest order of abstraction, does not outweigh the potential environmental benefits of allowing Riverkeeper to proceed. We, therefore, hold that the district court abused its considerable discretion in barring Riverkeeper's suit.

As for the merits of Riverkeeper's environmental claims, the district court concluded, after thorough deliberation, that the Corps' determinations that NWP 21 would have only "minimal cumulative adverse effect" on the environment, pursuant to the Clean Water Act, and "no significant impact" on the environment, pursuant to the National Environmental Policy Act, were neither arbitrary nor capricious. However, literally on the eve of oral argument in this Court, the Corps admitted that it had underestimated the acreage of waters that would be affected by the projects authorized under Nationwide Permit 21. In the face of this new and potentially significant change in the facts, we ordered the parties to provide supplemental briefing on the implications of the Corps' error. The Corps then conceded that the district court's decision must be reversed and the matter

3

remanded to the Corps for further consideration based on a more accurate assessment of the potential impacts of NWP 21.  We agree.

On remand, the Corps shall reconsider its conclusion that the environmental impacts of NWP 21 are minimal in light of all of the relevant data, including the Corps' recalculated figure for the acreage of waters affected by NWP 21.  We expect that it will take the Corps no longer than one year to do so, and, therefore, remand this case to the district court with instructions to remand the matter to the Corps, and to determine whether any further relief may be required.

I.

This case involves several complex statutory and regulatory schemes designed, in substantial measure, to ensure that the federal government conducts a thorough assessment of the environmental impacts of its actions.  Thus, under § 404 of the Clean Water Act ("CWA"), the Corps may issue permits for the discharge of dredged or fill material into navigable waters.  33 U.S.C. § 1344 (2012).  These permits can take the form of either individual permits, § 1344(a), or general permits, which authorize certain categories of discharges on a state, regional, or nationwide basis, § 1344(e).  Before issuing a general permit, however, the Corps must provide public notice and an opportunity for a hearing.  Id.  The Corps also must determine that the activities authorized by the permit are "similar in nature, will cause only minimal adverse environmental effects when performed

4

separately, and will have only minimal cumulative adverse effect on the environment." Id.  In determining whether the environmental effects of a general permit will be minimal, the Corps must consider a range of factors relating to the impact of discharges on aquatic ecosystems and the humans who use them, and must then document the environmental effects of the activities authorized by the permit in a decision document.  See generally 40 C.F.R. pt. 230 (2014).

The Corps is also obligated to comply with the National Environmental Policy Act ("NEPA").  NEPA, in turn, requires an Environmental Impact Statement for any "major Federal action[] significantly affecting the quality of the human environment," which can include nationwide permits issued by the Corps. 42 U.S.C. § 4332(2)(C) (2012); 33 C.F.R. § 330.5(b)(3) (2014).  The agency first prepares an Environmental Assessment, which is essentially a preliminary account of the environmental effects of a proposed action.  See 40 C.F.R. §§ 1501.4, 1508.9.  If the Environmental Assessment suggests that the effects of the action are likely to be significant, the agency must issue the more detailed Environmental Impact Statement.  See id. § 1501.4(c).  Otherwise, it issues a Finding of No Significant Impact.  Id. § 1501.4(e).

This case involves a challenge to Nationwide Permit 21, a general permit issued by the Corps.  It authorizes "[d]ischarges of dredged or fill material into waters of the United States associated with surface coal mining and reclamation

5

operations." Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184, 10,274 (Feb. 21, 2012). Surface coal mining involves the discharge of dredged or fill material in a variety of ways. To reach underground coal seams, surface mining operations must dig through and remove a mixture of soil, rock, and coal residue commonly referred to as "overburden," which is replaced once the coal has been extracted. Excess overburden must be deposited somewhere else -- occasionally filling or burying streams, or in the form of a much larger "valley fill," which is exactly what it sounds like. In other cases, the coal seam runs underneath the stream itself, and the operation will "mine through" the stream. Mining operations also generate and discharge material when they create sediment ponds and build roads, processing plants, and other mining infrastructure. As a result of the mining process, drainage from the mining site, which contains substantial amounts of sediment, salt, and metals, can seep into and contaminate larger waterways. This runoff may continue for decades after the mine has closed. The discharge of dredged or fill material, therefore, may have consequences for water quality and the health of aquatic ecosystems throughout the entire watershed.

The Corps has long struggled to ensure that the environmental impacts of surface mining operations are minimal. Nationwide Permit 21 was first issued in 1982, see Interim Final Rule for Regulatory Programs of the Corps of Engineers, 47 Fed. Reg. 31,794, 31,833 (July 22, 1982), and has subsequently been amended

6

and reissued multiple times.  The 2007 version did not place any limits on the length of streams that could be filled by authorized activities.  See Reissuance of Nationwide Permits, 72 Fed. Reg. 11,092, 11,184 (Mar. 12, 2007).  The Corps eventually became concerned that activities authorized by NWP 21 were resulting in greater environmental impacts than anticipated, and it suspended NWP 21 in six states in the Appalachian Region in 2010: Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.  Suspension of Nationwide Permit 21, 75 Fed. Reg. 34,711, 34,712 (June 18, 2010).  The Corps did not suspend NWP 21 in Alabama, although the Environmental Protection Agency subsequently stated in a letter to the Corps that "the same concerns and science that brought about the six state suspension appl[y] to the coal fields of Alabama."  The 2007 NWP 21 expired on March 18, 2012.  Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,092.

In 2012, the Corps adopted a new course intended, in part, to "address[] the concern that led to [its] previous suspension of NWP 21 in the six Appalachian states."  Reissuance of Nationwide Permits, 77 Fed. Reg. at 10,205.  As a result, the 2012 version of NWP 21, which authorized stream-filling operations for an additional five years, consisted largely of two new provisions.  First, paragraph (a), which functions as a grandfathering provision, allows for the reauthorization of operations which were previously authorized under the 2007 NWP 21, subject to verification by a district engineer that they will continue to cause only minimal

7

adverse effects.  Id. at 10,274.  As for new operations, however, paragraph (b) adds several specific limits on stream-filling activity, including a requirement that discharges "must not cause the loss of greater than 1/2-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed." Id.  Permitted activities also may not involve the construction of valley fills.  Id. The new limits provided by paragraph (b) do not apply to grandfathered reauthorizations under paragraph (a).

Along with the revised permit, the Corps issued a NWP 21 Decision Document explaining the rationale behind its revisions, which included the Corps' Clean Water Act and National Environmental Policy Act analyses.  Specifically, the Corps concluded, as required by the CWA, that activities authorized by NWP 21 would not have more than minimal cumulative adverse effect on the environment.  It also concluded, pursuant to NEPA, that NWP 21 would not significantly affect the environment, and that an Environmental Impact Statement would therefore not be required.  Under paragraph (a) of the 2012 NWP 21, forty-one projects have been reauthorized within the Black Warrior River watershed; the first reauthorization was granted in May 2012, while the last was granted in either

March or April 2013.[2]  The grandfathered portions of these projects authorize the filling of approximately twenty-seven miles of stream.

The plaintiffs in this case, Black Warrior Riverkeeper and Defenders of Wildlife, strongly disagree with the Corps' environmental impact analysis. Riverkeeper and Defenders are environmentalist groups whose members use waters of the Black Warrior River watershed that flow downstream from mining sites authorized to discharge material under NWP 21.  According to Riverkeeper, these projects have had a profound effect on the quality of the waters within the Black Warrior River watershed.  Riverkeeper's members have observed, for example, that waters downstream from mining sites are discolored and clouded with sediment and silt.  Impaired water quality, they claim, has "decrease[d] [their] aesthetic and recreational enjoyment, reduce[d] their opportunities to observe wildlife, and cause[d] them concern about ingesting the water and fish caught in the water."  To take just one example, Riverkeeper alleges that several coal mines permitted under NWP 21(a) ultimately drain into the Locust Fork of the Black Warrior River, releasing sedimentation, solids, and chemical compounds. Riverkeeper fears that what it calls the resulting "dirty or polluted water" will deter

---

[2] According to the district court, the final reverification was issued by the Corps in April 2013. However, the document cited by the district court does not list a reverification in April 2013; it instead lists one in April 2009, which is likely an error since this was well before the 2012 NWP 21 was even enacted and contradicts the date (December 27, 2012) listed on the reverification letter for the mine in question.  The difference, ultimately, does not affect our analysis.

its members and others from using the river for recreation -- the Locust Fork is one of the most popular whitewater paddling locations in the state -- as well as harm local wildlife.

In order to block the forty-one reauthorizations granted pursuant to NWP 21(a) and therefore avert further claimed environmental damage, Riverkeeper filed suit in the United States District Court for the Northern District of Alabama on November 25, 2013 against the Corps and several Corps officials.  The gravamen of Riverkeeper's lawsuit is that it was contradictory for the Corps to impose stream-fill limits on new operations, but, at the same time, decline to apply those very same limits to operations authorized by the 2007 NWP 21 and subsequently reauthorized by the 2012 version.  To put it slightly differently, Riverkeeper's argument is that the Corps could not rationally have found that these new limits were "necessary" to avoid significant environmental impacts, and then conclude regardless that the impacts of grandfathered projects would be minimal.

Specifically, Riverkeeper's complaint raised four counts: (1) that paragraph (a) of NWP 21, in effect, amounts to an unlawful ten-year permit term; (2) that the Corps' cumulative effects analysis under the CWA was arbitrary and capricious under the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2012); (3) that the Corps' issuance of reauthorizations in the Black Warrior River watershed pursuant

10

to NWP 21 was arbitrary and capricious; and (4) that the Corps' Finding of No Significant Impact under NEPA was arbitrary and capricious.

Eight days later, Riverkeeper moved for a preliminary injunction to suspend all reauthorizations in the Black Warrior River watershed. On December 23, 2013, the Alabama Coal Association and several mining companies[3] moved to intervene, citing the harm that Riverkeeper's requested injunction would cause to their mining operations. Their motion to intervene was granted without objection from Riverkeeper. At a February 2014 hearing on Riverkeeper's motion for a preliminary injunction, the district court refused to hear any argument on the merits because Riverkeeper could not post a $300,000 bond. The district court denied Riverkeeper's motion on February 18. Riverkeeper then moved for summary judgment on February 20. At a hearing on March 3, Riverkeeper voluntarily dismissed Count 3 of its complaint, claiming that it was no longer directly challenging the forty-one reauthorizations. On April 2, the Corps filed its cross-motion for summary judgment, addressing the merits; a week later, the Intervenors filed their motion to dismiss/motion for summary judgment, addressing the merits as well as standing and laches.

---

[3] The mining companies are MS&R Equipment Co., Inc., Reed Minerals, Inc., Twin Pines, LLC, and Walter Minerals, Inc.

11

Ultimately, the district court concluded that Riverkeeper had standing, but that its claims were barred by the doctrine of laches, and, in any event, that its claims failed on the merits. The district court rejected the Intervenors' argument that Riverkeeper lacks standing to challenge a permit under § 404, because Riverkeeper's injuries, which result from diminished downstream water quality, were cognizable under § 404 and traceable to NWP 21. The district court did, however, decide that Riverkeeper's delay in filing suit was inexcusable, and that the Intervenors suffered prejudice because they acted in reliance on reauthorizations granted under NWP 21. Finally, the district court concluded that the Corps did not act arbitrarily and capriciously in concluding that NWP 21 would have no more than minimal cumulative adverse effect on the environment. Riverkeeper timely appealed to this Court.[4]

## II.

We turn first, as we must, to the Intervenors' argument that Riverkeeper lacks standing to sue in federal court, and conclude that Riverkeeper does indeed have standing. We review issues of standing de novo. Swann v. Sec'y of State, 668 F.3d 1285, 1288 (11th Cir. 2012). "Standing is a jurisdictional inquiry, and a

---

[4] Riverkeeper has not challenged the district court's judgment on Count 1 that the grandfather provision of NWP 21(a) does not violate Section 404(e) by extending the term of NWP 21 past five years. Riverkeeper challenges the court's judgments on Counts 2 and 4 of its complaint, solely on the ground that the district court failed to consider the Corps' alleged differential treatment error, as well as the court's judgment that the action is barred by laches.

'party invoking federal jurisdiction bears the burden' of establishing that he has standing to sue." Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty., Fla., 690 F.3d 1244, 1247 (11th Cir. 2012) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)). It is by now hornbook law that plaintiffs "must satisfy three requirements to have standing under Article III of the Constitution: (1) 'injury-in-fact'; (2) 'a causal connection between the asserted injury-in-fact and the challenged action of the defendant'; and (3) 'that the injury will be redressed by a favorable decision.'" Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1328 (11th Cir. 2013) (quoting Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001)). When, as in this case, a plaintiff's injury arises from the government's allegedly unlawful regulation of a third party, "much more is needed." Lujan, 504 U.S. at 562. The plaintiff must show that choices will be made by both the regulator and the regulated party "in such manner as to produce causation and permit redressability of injury." Id. Lastly, a plaintiff who brings suit under the APA must establish that its injury-in-fact "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990).

In addition to showing that their members have standing, Riverkeeper and Defenders must demonstrate organizational standing. "An organization has standing to bring an action on its members' behalf if '(a) its members would

13

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" Am. Civil Liberties Union of Fla., Inc., 690 F.3d at 1248 (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)).  The Intervenors do not challenge the organizational standing of Riverkeeper and Defenders, and in any event, such a challenge would be meritless, as these organizations plainly have standing to assert the claims of their members.  The relevant question, then, is whether their members have standing.

Riverkeeper's suit is grounded on a procedural challenge to the Corps' decision to issue Nationwide Permit 21.  That is, Riverkeeper argues that the Corps arbitrarily and capriciously determined that NWP 21 would result in minimal environmental impacts.  On this basis alone, Riverkeeper cannot claim constitutional standing.  "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation -- a procedural right in vacuo -- is insufficient to create Article III standing." Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009).  To establish standing, then, Riverkeeper must show that the Corps' failure to adequately consider environmental harms injured Riverkeeper in some palpable way.

14

As we see it, and as the district court properly concluded, Riverkeeper has clearly shown an injury-in-fact within the ambit of the Clean Water Act and the National Environmental Policy Act.  We have held that an individual plaintiff may show injury-in-fact "by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed." Sierra Club v. Tenn. Valley Auth., 430 F.3d 1337, 1344 (11th Cir. 2005); see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183 (2000).  Voluminous record evidence indicates that Riverkeeper's members have suffered harm to their aesthetic and recreational interests.  Riverkeeper's members attest that they use waters downstream from mining sites for recreational and other purposes; that those waters are visibly polluted; that the pollution of those waters decreases their enjoyment of them; and that pollution has impaired habitats for wildlife they like to observe and study.  Riverkeeper's members also claim that they have been exposed to threats to their health by drinking water from and using affected areas.  All of these injuries fall within the zone of interests contemplated by the CWA and NEPA, since they allegedly stem from environmental harm.

Nor do we think any serious argument can be made against Riverkeeper's standing on the grounds of causation or redressability.  We agree that a plaintiff need not prove that their injury can be traced to specific molecules of pollution

15

emitted by the alleged polluter.  It is enough that a plaintiff "'show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern." Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 161 (4th Cir. 2000) (quoting Natural Res. Def. Council, Inc. v. Watkins, 954 F.2d 974, 980 (4th Cir. 1992)).  Riverkeeper has alleged that its members use areas downstream from the forty-one stream-filling operations grandfathered under the 2012 NWP 21.  The Corps also indicated in its NWP 21 Decision Document that activities authorized by NWP 21 could, in fact, lead to the very aesthetic, recreational, and other environmental injuries alleged by Riverkeeper -- the Corps merely concluded that those harms would be minor. Likewise, vacatur of NWP 21 would redress these injuries; surface mining operations would be required either to comply with paragraph (b)'s stream-fill limits or obtain individual permits from the Corps.  Indeed, the Intervenors have not shown that Riverkeeper has failed to meet any of these traditional components (injury-in-fact, causation, and redressability) of the standing inquiry.

The Intervenors instead present a novel argument -- which, to the best of our knowledge, has not been accepted by any court -- that these injuries are wholly untraceable to the Corps' decision to issue a permit under § 404.  They explain that they engage in surface mining activities that actually require permits under both

16

§ 402[5] and § 404 of the Clean Water Act.  All surface drainage from a mining site must first pass through a sediment pond before being discharged into downstream waters.  The subsequent discharge from the sediment pond must be authorized by a permit under § 402, which independently imposes effluent limits on the concentration of pollutants.  The Intervenors' argument thus draws a sharp distinction between § 402 permits, which take downstream water quality into consideration, and § 404 permits, which are principally concerned with minimizing the actual physical loss of waters of the United States.  The Intervenors claim that the proper course for Riverkeeper is to bring a different lawsuit: one which either asserts that surface mining operations in the Black Warrior River watershed have violated their § 402 permits, or that the terms of those permits should be tightened.  What Riverkeeper cannot do, according to the Intervenors, is file suit to challenge the Corps' § 404 permitting decision.

---

[5] Section 402 authorizes the Administrator of the EPA to issue a permit for the release of any pollutant, except for the dredged or fill material covered by § 404.  33 U.S.C. § 1342 (2012); see also § 1342(a)(1) (granting authority "[e]xcept as provided in sections 1328 and 1344 of this title," the latter of which deals with dredged or fill material).  It also allows states to apply to the EPA for the right to administer their own permit programs under § 402, which then supplant the EPA's permitting system if approved.  33 U.S.C. § 1342(b).  Section 402 permitting decisions are governed by standards provided in § 403 of the Clean Water Act, 33 U.S.C. § 1343.  Alabama has been granted authority to administer its own permit program, Ala. Admin. Code r. 335-6-6-.01 (2014), and does so through the Alabama Department of Environmental Management.  Alabama law also provides that all surface drainage must pass through a sediment pond and comply with state and federal water quality standards.  Ala. Admin. Code. r. 880-X-10C-.13 (2014).

17

We find this argument, which operates on a cramped understanding of the § 404 permitting process, to be unconvincing. Congress plainly mandated that the Corps consider downstream water quality when issuing a § 404 permit. Section 404 itself instructs the Corps to develop guidelines "based upon criteria comparable to the criteria" established by § 403 of the Clean Water Act, 33 U.S.C. § 1344(b), which notably include "the effect of disposal of pollutants on human health or welfare . . . [and] marine life" as well as "the effect of disposal, [sic] of pollutants on esthetic, recreation[al], and economic values," 33 U.S.C. § 1343(c)(1). In response to this congressional mandate, the Corps and the EPA jointly promulgated the § 404(b)(1) Guidelines, which place the very same emphasis on "human health or welfare," the stability of "aquatic ecosystems," and "recreational, aesthetic, and economic values." 40 C.F.R. § 230.10. The Intervenors do not argue that the Corps lacks the authority to consider downstream water quality, a proposition we would be hard-pressed to accept since we must defer to an agency's reasonable interpretation of a statute defining its jurisdiction. See City of Arlington, Tex. v. FCC, 133 S. Ct. 1863, 1870-71 (2013). Rather, the Intervenors suggest that it would be improper for the Corps to do so where the regulated activity is already covered by a § 402 permit. But they cite to no authority, judicial or otherwise, in support of this claim.[6] They merely cite to a

_____

[6] Other courts have rejected the Intervenors' view of the Corps' regulatory authority. In El

18

statement by an engineer that the § 402 permit is the "exclusive vehicle for regulating downstream water quality." This statement simply cannot bear the weight of the Intervenors' argument on standing.

The Intervenors also fail to explain how the distinction between § 404 permits and § 402 permits affects injury-in-fact, causation, or redressability -- the core elements of standing. The scope of the Corps' regulatory authority has no bearing on whether Riverkeeper's members have suffered injury. And, as we see it, Riverkeeper's alleged injuries are included within the zone of interests of § 404 and its implementing regulations, which expressly consider downstream water quality. The zone-of-interests test "is not meant to be especially demanding." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987). Similarly, the distinction drawn by the Intervenors between §§ 402 and 404 implicates neither causation nor redressability. At most, the Intervenors have shown that Riverkeeper's injuries arguably stem from two failures of regulation -- a failure by the Corps under § 404,

Dorado Chemical Co. v. U.S. EPA, the Eighth Circuit concluded that nothing in the text of the Clean Water Act indicates that the National Pollutant Discharge Elimination System permit program "must be the exclusive means for protecting downstream waters." 763 F.3d 950, 959 (8th Cir. 2014). Similarly, in Mingo Logan Coal Company, Inc. v. U.S. EPA, a district court rejected the Intervenors' argument that an agency acting under § 404 lacks authority to consider downstream water quality whenever the regulated activity is also covered under § 402. No. 10–0541 (ABJ), 2014 WL 4828883, at *19-20 (D.D.C. Sept. 30, 2014). The facts of Mingo Logan bear strong similarity to those here, as it too dealt with discharges from mining sites that pass through § 402-regulated sediment basins. Id. at *19. While neither of these cases dictate our result, we find them persuasive; they underscore the lack of support for the Intervenors' claim that the existence of a § 402 permit somehow strips the Corps of authority to consider downstream water quality under § 404 as well.

19

and a failure by the Alabama Department of Environmental Management under § 402. But that does not mean that Riverkeeper only has standing to challenge one failure and not the other. Vacating NWP 21 would redress Riverkeeper's injuries, whether or not some other administrative action might also redress those injuries.

The only two cases to have considered the Intervenors' standing argument have rejected it. In the first, Kentucky Riverkeeper, Inc. v. Midkiff, a district court addressed the issues of causation and redressability, and determined that the industry intervenors' "attempt to limit Plaintiffs' members' interests to the point of discharge fails to recognize how the discharge of dredged or fill materials impacts downstream waterways." 800 F. Supp. 2d 846, 862 (E.D. Ky. 2011), rev'd on other grounds and remanded sub nom. Ky. Riverkeeper, Inc. v. Rowlette, 714 F.3d 402 (6th Cir. 2013). In the second, Kentuckians for Commonwealth v. U.S. Army Corps of Engineers, another district court rejected a mining company's argument that "because Plaintiffs complain about injuries caused by downstream water quality impacts, their injuries fall under the zone of interests protected by a § 402 [National Pollutant Discharge Elimination System] permit and not a § 404 fill permit." 963 F. Supp. 2d 670, 681 (W.D. Ky. 2013), aff'd sub nom. Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs, 746 F.3d 698 (6th Cir. 2014). It determined that the zone-of-interests test should not be construed so

20

narrowly and that the plaintiffs had adequately alleged injuries stemming from the permitted fill operations.  Id. at 681.

However, even if we were to hold that Riverkeeper lacks standing to sue under the Clean Water Act (and we do not), we do not see how the Intervenors' argument affects Riverkeeper's standing to sue under the National Environmental Policy Act.  The Corps is required to determine whether the issuance of a nationwide permit is a "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 33 C.F.R. § 330.5(b)(3).  This analysis turns on, among other things, "(i) the environmental impact of the proposed action, [and] (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented."  42 U.S.C. § 4332(2)(C).  This broad language includes diminution in downstream water quality caused by activities authorized under NWP 21, whether or not § 404 of the CWA does.  But, as we have explained, downstream water quality is relevant under both § 404 of the CWA and NEPA.  Thus, we conclude that Riverkeeper has standing to pursue both its CWA and NEPA claims, and, therefore, affirm the district court's decision on this point.

## III.

We turn next to whether Riverkeeper's suit is barred by laches.  Laches is a defense sounding in equity that serves to bar suit by a plaintiff "whose unexcused

21

delay, if the suit were allowed, would be prejudicial to the defendant." Russell v.

Todd, 309 U.S. 280, 287 (1940); see Envtl. Def. Fund, Inc. v. Alexander, 614 F.2d

474, 478 (5th Cir. 1980) ("[E]quitable remedies are not available if granting the

remedy would be inequitable to the defendant because of the plaintiff's long

delay.").[7]  We review a district court's laches determination under an abuse-of-

discretion standard.  Peter Letterese & Assocs., Inc. v. World Inst. of Scientology

Enters., Int'l, 533 F.3d 1287, 1319 n.38 (11th Cir. 2008).  To establish a laches

defense, "[t]he defendant must show a delay in asserting a right or claim, that the

delay was not excusable and that there was undue prejudice to the party against

whom the claim is asserted."  Ecology Ctr. of La., Inc. v. Coleman, 515 F.2d 860,

867 (5th Cir. 1975).  Applying these standards, the district court found

Riverkeeper's "delay of 9-10 months to be unexcused and, in fact, inexcusable."

The district court also determined that the coal industry suffered prejudice in the

form of expenditures made in reliance on reauthorizations granted under

Nationwide Permit 21.  Accordingly, the district court held that laches barred

Riverkeeper's suit.

After thorough review of the record, we are constrained to conclude, as a

matter of law, that the district court's decision on laches was an abuse of

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

discretion.[8]  At the outset, we observe that the district court's discretion is not unbounded.  Discretion means "that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law."  Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005) (per curiam) (quotation omitted).  We do not lightly conclude that the district court abused its discretion, but must review the record carefully to determine whether its application of laches can reasonably be sustained.

As we see it, the district court's primary mistake lies not in its calculation of how long Riverkeeper delayed in bringing this complex suit, but in its conclusion that Riverkeeper failed to show any excuse for that delay.  We agree that Riverkeeper could only have brought suit once the first reverification was issued by the Corps.  Riverkeeper challenges a procedural flaw in the promulgation of Nationwide Permit 21, and its cause of action therefore accrued on February 21, 2012, when NWP 21 was reissued.  See, e.g., Cedars-Sinai Med. Ctr. v. Shalala, 177 F.3d 1126, 1129 (9th Cir. 1999); Reissuance of Nationwide Permits, 77 Fed. Reg. at 10,184.  But, as we've noted, deprivation of a mere procedural right,

---

[8] Because we hold that the district court abused its discretion in applying the laches factors, we need not and do not decide whether the Supreme Court's recent decision in Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962 (2014), bars the application of laches to this case.  Nor do we decide whether to join our sister circuits in suggesting that laches "must be invoked sparingly in environmental cases."  Pres. Coal., Inc. v. Pierce, 667 F.2d 851, 854 (9th Cir. 1982).

23

without injury, does not suffice to create standing -- a point the Intervenors themselves stress with respect to the standing analysis in this case. See Summers, 555 U.S. at 496. Similarly, we have held that where an agency's scheme requires further site-specific actions to implement that scheme, a plaintiff's injury is not ripe until such actions have been proposed. Wilderness Soc'y v. Alcock, 83 F.3d 386, 391 (11th Cir. 1996). Until the Corps actually began to issue reauthorizations, it was unclear "when or how" Riverkeeper would be injured, and "this factual underpinning is vital to a full-fledged judicial review" of NWP 21. Id. at 390-91.

Since Riverkeeper likely lacked standing until those reauthorizations were issued, Riverkeeper could not have brought suit until, at the earliest, May 2012, when the Corps granted the first reauthorization. Riverkeeper cannot be faulted for failing to bring suit before then, because "[p]laintiffs cannot sleep on rights until such rights come into existence." Clark v. Volpe, 342 F. Supp. 1324, 1328 (E.D. La.), aff'd, 461 F.2d 1266 (5th Cir. 1972) (per curiam). But it was also reasonable for Riverkeeper to wait until February 2013, when the deadline for seeking reauthorizations passed and a substantial number of reauthorizations had been granted, so that it could discover the full extent of operations reauthorized by NWP 21. This shortens the period of delay to some nine or ten months, as the district court found.

The district court, however, abused its discretion when it gave no weight to Riverkeeper's need to evaluate, investigate, and prepare its claims for litigation. Before the district court, Riverkeeper explained that it needed time to file FOIA requests and analyze the documents it had received from the Corps. The district court's opinion makes no mention of these concerns, which strike us as plainly legitimate. In failing to address these potential excuses for delay, the district court overlooked relevant circuit precedent. In Save Our Wetlands, Inc. v. U.S. Army Corps of Engineers, in binding precedent, the former Fifth Circuit weighed whether the plaintiffs' lack of knowledge provided an excuse for their delay in filing suit to challenge a real estate development project. 549 F.2d 1021 (5th Cir. 1977). The Court observed that the plaintiffs "were entitled to presume that the public officials responsible for approving the [development] project would act in accordance with the law." Id. at 1027-28. It concluded that the plaintiffs could not rely on their alleged lack of knowledge given the "publicity" of the development, as well as the "public notice" of the developer's permit application, and therefore held that laches applied. Id. at 1028. Similarly, in another case involving the Corps, the former Fifth Circuit said that "the government must show that those whom it seeks to bar by invoking laches were or should have been aware of the questionable nature of the governmental activity." Envtl. Def. Fund, Inc., 614 F.2d

25

at 479.  We read these cases to indicate that a plaintiff's lack of knowledge or need to investigate further can serve as reason for delay.

Riverkeeper has provided sufficient reason for its minimal delay in bringing this lawsuit.  The Corps is not obliged to provide public notice of authorizations granted under a general permit, see 33 C.F.R. § 330.5(d)(3), nor is there any suggestion in the record that notice was provided.  Generally, Riverkeeper could not have discovered that filling operations had begun pursuant to those grants without intruding upon private property.  As we see it, it was patently reasonable for Riverkeeper to wait and then file FOIA requests to ascertain the scope of the reauthorizations granted under NWP 21(a) after the deadline for seeking reauthorization passed in February 2013.  Afterward, Riverkeeper needed time to review the fruits of its FOIA requests and prepare a case.  If we were to hold that a plaintiff's reasonable need to fully investigate its claims does not excuse delay, we would create a powerful and perverse incentive for plaintiffs to file premature and even frivolous suits to avoid the invocation of laches.  Indeed, the Intervenors' "argument suggests that a plaintiff challenging a mining permit should file lawsuits immediately as the permits are issued, without thoroughly examining the agency's records, the permits and other information before asserting a failure to comply with the requirements of NEPA or the CWA."  Ohio Valley Envtl. Coal. v. U.S. Army

Corps of Eng'rs, No. CIV.A. 3:05-0784, 2006 WL 2228991, at *2 (S.D. W. Va. Aug. 3, 2006).

Once Riverkeeper's need to properly prepare for litigation is accounted for, the length of Riverkeeper's delay drops to a few months at worst. This is too slender a reed on which to base a laches defense. Our cases applying laches in complex environmental litigation have generally involved a delay amounting to several years, without any reasonable excuse. See, e.g., Envtl. Def. Fund, Inc., 614 F.2d at 479 (five to nine years); Save Our Wetlands, Inc., 549 F.2d at 1027-28 (nineteen months to two and a half years); see also Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1338 (10th Cir. 1982) (more than three years).[9] Here, a period of several months, during which Riverkeeper was actively engaged in preparing its lawsuit, cannot constitute inexcusable delay.

Finally, we observe that Riverkeeper's delay falls well within the six-year statute of limitations that applies to actions against the government. 28 U.S.C.

---

[9] The only cases provided by the Intervenors involving shorter delays are readily distinguished. For instance, in Allens Creek/Corbetts Glen Preservation Group, Inc. v. West, the plaintiffs were indisputably well-informed about the wetlands project at issue, yet only filed suit after the existing wetlands had already been filled and construction was 95% complete, nearly eight months later. 2 F. App'x 162, 165 (2d Cir. 2001). And in Friends of Magurrewock, Inc. v. U.S. Army Corps of Engineers, which relied substantially on the district court decision in Allens Creek, the issue of delay arose in the context of a preliminary injunction, rather than a laches defense. 498 F. Supp. 2d 365, 378 (D. Me. 2007). Moreover, the plaintiff in that case, unlike Riverkeeper, could not present any excuse for its delay, and the "record [was] silent as to why it did not act earlier." Id. at 379.

§ 2401(a) (2012); see, e.g., Ctr. for Biological Diversity v. Hamilton, 453 F.3d 1331, 1334 (11th Cir. 2006) (per curiam) ("The Act prescribes no statute of limitations, so the general six-year statute of limitations for suits against the United States applies."); Sierra Club v. Slater, 120 F.3d 623, 631 (6th Cir. 1997) ("It appears . . . beyond question that the six-year statute of limitations of section 2401(a) applies to actions brought pursuant to the APA."). As we have held in the context of copyright infringement, "there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run." Peter Letterese & Assocs., Inc., 533 F.3d at 1320.[10] We do not mean to suggest that laches should "be determined merely by a reference to and a mechanical application of the statute of limitations." Gardner v. Panama R. Co., 342 U.S. 29, 31 (1951) (per curiam). But, coupled with Riverkeeper's need to investigate its claims, the fact that Riverkeeper's delay was a scant few months leads us to conclude that its delay was reasonable.

Inexcusable delay and prejudice are both necessary elements of the defense of laches, so our conclusion that Riverkeeper's delay was reasonable is sufficient

---

[10] The Supreme Court's holding in Petrella, 134 S. Ct. 1962, does not disturb this proposition. Petrella held only that when a copyright infringement suit seeks the legal relief of damages, and falls within the applicable statute of limitations, it is not barred by laches. Id. at 1974. In other words, such a lawsuit is not merely presumptively timely -- it is timely per se. The Court also indicated that the plaintiff's delay could still, in "extraordinary circumstances," limit their potential equitable relief. Id. at 1977-79. Here, Riverkeeper seeks equitable relief, but its suit is not barred by laches because its delay was altogether reasonable.

to dispose of this issue.  See, e.g., Howard v. Roadway Express, Inc., 726 F.2d 1529, 1533 (11th Cir. 1984) (declining to discuss prejudice because of the lack of inexcusable delay).  The Intervenors, however, have also failed to establish prejudice.  In evaluating prejudice, we "balance the equities," weighing both the harm to the Intervenors as well as the environmental benefits that might result if Riverkeeper is allowed to pursue its claims.  Save Our Wetlands, Inc., 549 F.2d at 1028.  Any harm demonstrated by the Intervenors must stem specifically from Riverkeeper's delay in bringing suit, rather than from the consequences of an adverse decision on the merits, for "prejudice does not arise 'merely because one loses what otherwise he would have kept.'"  Baylor Univ. Med. Ctr. v. Heckler, 758 F.2d 1052, 1058 (5th Cir. 1985) (quoting In re Bohart, 743 F.2d 313, 327 (5th Cir. 1984)).  In other words, the Intervenors must establish that they were made significantly worse off because Riverkeeper did not bring suit as soon as it had the opportunity to do so.  The paradigmatic example of prejudice is when a defendant has expended substantial sums of money or completed a significant amount of construction by the time the plaintiff decides to file suit.  Save Our Wetlands, Inc. 549 F.2d at 1028-29; see also William Murray Tabb, Reconsidering the Application of Laches in Environmental Litigation, 14 Harv. Envtl. L. Rev. 377, 393 (1990) ("[C]ourts have typically restricted their investigations to whether substantial resources have been committed and construction has commenced.").

29

The district court abused its discretion when it concluded that the bare and insubstantial allegations of prejudice presented by the Intervenors outweighed the environmental benefits of allowing Riverkeeper to proceed.  We do not dispute that the Intervenors might be hurt by vacatur of NWP 21, but that is a different inquiry altogether from whether they have been hurt by Riverkeeper's delay.  The district court rested its analysis on several affidavits from coal company executives which state that the Intervenors relied on their reauthorizations to "purchase mining equipment, hire mine workers, enter into various contracts, make sales commitments to customers . . . [and] continue[] or initiate[] mine development and acquire[] land."  But this showing was deficient in several respects.  First of all, these affidavits, which were offered in support of the Intervenors' motion to intervene, are presented at a very high order of abstraction, and do not differentiate between the harm that would result if Riverkeeper ultimately prevails on the merits, and the harm that resulted from Riverkeeper's delay.  To take one example, the affidavit from George Barber, president of the Alabama Coal Association, says that "[i]f the injunction that plaintiffs have requested is issued, [the Intervenors] . . . will be severely prejudiced."  Even assuming that these affidavits could speak to the harm caused by Riverkeeper's delay, they would not say very much.  They do not specify the financial hit the companies will take as a result of delay, nor do they provide any further detail about the steps they took during the

30

time Riverkeeper neglected to file suit.  Notably, in our cases that have barred suit on the basis of laches, we have generally required much more specific and concrete figures for how much money has been spent on a project and how much of the project has been completed.  See, e.g., Envtl. Def. Fund, Inc., 614 F.2d at 480; Save Our Wetlands, Inc., 549 F.2d at 1028-29.

The district court also failed to credit the environmental benefits that might result from allowing Riverkeeper's lawsuit to proceed.  Riverkeeper identifies over twenty-seven miles of streams that would be filled by the forty-one grandfathered projects.  The district court attributed little weight to this factor for two reasons.  First, if Riverkeeper prevails, the Intervenors' mining operations would proceed under a new general permit or individual permits.  But Riverkeeper would likewise be able to challenge these new schemes in the event the Corps failed to conduct a sufficient analysis of their environmental impact.  Second, the district court noted that Riverkeeper's argument on laches assumes the truth of its argument on the merits.  The environmental benefits of vacating NWP 21 are only "significant" if Riverkeeper is correct that the Corps erroneously concluded that the impacts of NWP 21 would be minimal.  Our cases applying laches, however, have tended to take plaintiffs' reasonable allegations at face value in determining environmental benefits.  Thus, for example, in Ecology Center of Louisiana, Inc., we credited the plaintiffs' allegations that a highway project would cause "irreparable injuries" to

31

some of the "most productive ecosystems on earth" in calculating prejudice. 515 F.2d at 868-69 (internal quotation marks omitted). Nor is there any suggestion in the record that a significant percentage of streams has already been filled, which would mitigate Riverkeeper's claimed environmental benefits. See id. at 869.

We cannot say on this record that Riverkeeper's delay was unreasonable, or that the Intervenors have suffered significant prejudice as a result of that delay. We find, therefore, that the district court abused its discretion in barring Riverkeeper's suit on the basis of laches.

## IV.

Thus, we are obliged to address the merits question at the center of this case: whether the Corps' Clean Water Act and National Environmental Policy Act determinations were arbitrary and capricious. The district court held that they were not, because the Corps conducted a holistic review of Nationwide Permit 21's environmental impacts and reasonably concluded that they would be minimal. On appeal, Riverkeeper challenges a single error in the Corps' reasoning, which it calls the "differential treatment error." Riverkeeper argues that it was arbitrary and capricious for the Corps to conclude, on the one hand, that the new stream-fill limits contained in paragraph (b) of NWP 21 are necessary to avoid significant environmental effects, but on the other, to decline to apply them to projects reauthorized pursuant to paragraph (a). The core question in this appeal, then, is

whether the Corps could reasonably conclude that NWP 21, taken as a whole, would have minimal effects.

We review the district court's decision to grant summary judgment to the Corps and the Intervenors on the merits de novo, while applying the appropriate standard of review to the agency's decision. Defenders of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1114 (11th Cir. 2013). Under the Administrative Procedure Act, we must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. In determining whether the agency acted arbitrarily and capriciously, we ask whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Importantly, "a court is not to substitute its judgment for that of the agency." Id. While we should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), "[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given," State Farm, 463 U.S. at 43. Likewise, we review an agency's Finding of No Significant Impact and decision not to prepare an Environmental Impact Statement, pursuant to NEPA, under the same arbitrary-and-capricious standard. Hill v. Boy, 144 F.3d

33

1446, 1450 (11th Cir. 1998). Our task ultimately, then, is to "ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002).

The problem we now face, however, is that we can't evaluate whether the Corps' CWA and NEPA determinations were arbitrary and capricious on this record. As we have recounted, the Corps admitted on the eve of oral argument that it underestimated the number of acres of waters that may be impacted by NWP 21. Specifically, the Corps stated that it "did not take into account that activities re-verified under paragraph (a) could impact more than a half-acre of waters of the United States." Nevertheless, the Corps hinted that the underestimate might not affect its determination that the environmental effects of NWP 21 would be minimal. In its supplemental briefing, the Corps also suggested that various features of the 2012 NWP 21, such as its requirements for individual reverification and compensatory mitigation, might indicate that the Corps' error was "harmless." Even though NWP 21 will affect more waters in the aggregate than the Corps anticipated, these two requirements could function to ensure that the impacts of any one project will be matched with sufficient compensatory mitigation to render the overall effect on the environment minimal.

34

Our dissenting colleague objects to the Corps' reasoning on the grounds that the Corps' miscalculation shows that it failed to consider the "actual impact" of paragraph (a) reauthorizations. She also observes that the Corps subsequently admitted that its factual projections were an "integral component" of its cumulative impact analysis. As we see it, the Corps may well conclude on remand that its factual projections were indeed so erroneous that individual reverification and compensatory mitigation cannot ensure that the cumulative adverse effect of NWP 21 on the environment will be minimal. Or, as the Corps suggests, it "may be able readily to cure [this] defect in its explanation," and reaffirm its original decision. Heartland Reg'l Med. Ctr. v. Sebelius, 566 F.3d 193, 198 (D.C. Cir. 2009). The Corps' analysis, after all, was based on a holistic account of all of the terms and requirements stipulated in NWP 21, including compensatory mitigation and individual reverification. The fact that the Corps underestimated the acreage of waters that would be impacted by paragraph (a) does not necessarily undermine the other aspects of the Corps' analysis.[11] The long and short of it is that we can't tell

---

[11] The dissent also suggests that the Corps failed to take a "hard look" at the environmental consequences of NWP 21, in violation of NEPA. NEPA, however, "does not mandate perfection" in preparing the documentation it requires. Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin., 772 F.2d 700, 712 (11th Cir. 1985). On remand, the Corps should consider whether its Finding of No Significant Impact is sustainable in light of the terms of NWP 21, regardless of its miscalculation.

35

on this limited record, and we think it wiser to leave the matter to the district court to analyze in the first instance.

In light of the Corps' admission, we are confident that the Corps has committed an error in its review, but we are unable to discern whether that error truly is significant.[12]  The bottom line is that we cannot now say that the Corps' ultimate conclusion -- that NWP 21 will have minimal effects -- was unlawful. We, therefore, believe that the proper course is to remand the matter to the district court with instructions to remand to the Corps for a full reconsideration of its CWA and NEPA determinations.  On remand, the Corps should determine both the effect of its underestimate of the acreage of impacted waters on its earlier analysis, as well as whether it stands by its overall determination that the effects of activities authorized by NWP 21 will be cumulatively insignificant.

We are not compelled to, nor will we, vacate NWP 21 at this time and in the face of this incomplete record.  Whether a court may remand a matter to an agency without vacating the agency's action is a question of first impression in our circuit.

---

[12] We decline to address the alleged "differential treatment error," except to note that the Corps' miscalculation of environmental impacts bears on this point as well.  Thus, for example, the Corps asserts that each grandfathered project will be individually reverified to have no more than minimal cumulative impacts and will be required to engage in compensatory mitigation to offset any impacts that result.  The Corps contends that these requirements compensate for the lack of specific stream-fill limits in paragraph (a).  As we've explained, the efficacy of individual reverification and compensatory mitigation may well turn on a more comprehensive and accurate accounting of the effects of NWP 21.  It would be premature for us to render a decision on this issue without a sense of how the Corps' miscalculation may bear on its overall analysis.

We "agree, as have most other courts, that the . . . remedy of remand without vacatur is within a reviewing court's equity powers under the APA." Sierra Club v. Van Antwerp, 526 F.3d 1353, 1369 (11th Cir. 2008) (Kravitch, J., concurring in part and dissenting in part). Plainly, the federal courts possess broad discretion to fashion an equitable remedy. See, e.g., Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."); Ford Motor Co. v. NLRB, 305 U.S. 364, 373 (1939) ("[W]hile the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action."). Undeniably, vacatur is "equitable relief." See Alabama v. Ctrs. for Medicare & Medicaid Servs., 674 F.3d 1241, 1244 (11th Cir. 2012) (per curiam). The decision whether to vacate agency action falls within our broad equitable discretion.

Indeed, our sister circuits that have considered this question have concluded that remand without vacatur is permitted under the APA. See, e.g., Cal. Cmtys. Against Toxics v. U.S. EPA, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam); Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1380 (Fed. Cir. 2001); Cent. Me. Power Co. v. FERC, 252 F.3d 34, 48 (1st Cir. 2001); Cent. & S. W. Servs., Inc. v. U.S. EPA, 220 F.3d 683, 692 (5th Cir. 2000);

37

Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150 (D.C. Cir. 1993).  While we do not dispute that "vacatur . . . is the ordinary APA remedy," Sierra Club v. Van Antwerp, 526 F.3d at 1369 (Kravitch, J., concurring in part and dissenting in part), neither can we conclude that it is the only one.  In circumstances like these, where it is not at all clear that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate.  We need not, and do not, decide whether remand without vacatur is permissible when the agency has erred to such an extent as to indicate that its ultimate decision was unlawful.

In deciding whether an agency's action should be remanded without vacatur, a court must balance the equities.  Indeed, the United States Court of Appeals for the District of Columbia Circuit has developed an instructive test for determining when a court should remand without vacating the agency's action.  That test considers "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  Allied-Signal, Inc., 988 F.2d at 150-51 (quotation omitted); see also Sierra Club v. Van Antwerp, 526 F.3d at 1369 (Kravitch, J., concurring in part and dissenting in part) ("[I]t is appropriate to consider the balance of equities and the public interest, along with the magnitude of the agency's errors and the likelihood that they can be cured.").  Among the

38

equities to be balanced in this case are both the disruptive consequences to the mining industry, as well as the potential environmental damage that might continue unabated while the Corps revisits its determinations. We reject Riverkeeper's argument that the potential disruption to the mining industry is irrelevant. Here, vacatur could suspend a substantial amount of surface mining in the state of Alabama, all for an error that may well turn out to be inconsequential. Cf. Cal. Cmtys. Against Toxics, 688 F.3d at 994 (declining to vacate an EPA emissions rule where vacatur would be "economically disastrous"). While we do not conclude that vacatur would, in fact, be disruptive -- nor determine whether the Corps' error was slight -- such consequences are clearly relevant to a court's equitable balancing calculus.

However, we hesitate to balance these equities in the first instance, and without any guidance from the district court. The parties' supplemental briefing provides this Court with only the roughest sketch of the extent and implications of the Corps' error. Indeed, the Corps has suggested that the precise amount of waters of the United States that will be impacted could be immaterial to the Corps' reasoning, which rests, at least in part, on the use of individual reverification and compensatory mitigation. In addition, evaluating the potentially disruptive consequences of vacatur may require additional fact-finding, particularly with respect to the costs to the coal industry and the environmental harm of stream-

filling, that as an appellate court we are not generally equipped to conduct, let alone on this largely barren record. See, e.g., Green v. Zant, 715 F.2d 551, 559 (11th Cir. 1983) ("Fact finding is the basic responsibility of the district courts, rather than the appellate courts."). Specifically, we do not know whether the mining companies will be able to obtain individual permits in an expeditious fashion or whether their mining operations can be redesigned to meet the new stream-fill limits in paragraph (b). We cannot discern the effect of a temporary suspension on their mining operations, measured, for example, in layoffs, lost wages, and unfulfilled contracts. Nor do we know whether the other terms of NWP 21, including compensatory mitigation, will suffice to ensure limited impacts on the Black Warrior River watershed, or whether these impacts can be reversed or mitigated if NWP 21 is later nullified. Without these essential facts and others, we cannot determine whether the equities weigh in favor of vacating NWP 21.

The suggestion has been made that, at the very least, the district court should suspend all reauthorizations for projects where filling activities have not yet begun. After all, the dissent observes, the Intervenors have only offered evidence as to some of the reauthorizations granted pursuant to NWP 21(a). But this is precisely the point. We don't know, for example, whether the other projects are scheduled to commence operations in the near future, or whether they've already hired employees and executed contracts on the assumption that operations will soon

40

commence.  Our colleague may be right that NWP 21 can be suspended as to these operations without devastating consequences to the mining industry.  She also may be wrong.  It is the district court, however, that is best-suited to make these fine-grained and fact-intensive determinations.  As we've explained, we take no position on whether the district court should suspend or vacate NWP 21, in whole or in part.  Instead of deciding that difficult question on an incomplete record, we leave it to the sound discretion of the district court in the first instance.

We, therefore, reverse the district court's ruling on the merits and remand with the following instructions.  The district court shall remand the matter to the Corps for a thorough reevaluation of the Corps' CWA and NEPA determinations in light of all of the relevant data, including the Corps' recalculated figure for the acreage of waters affected by NWP 21.  The district court may also determine whether any further relief, including vacatur, is required in light of the Corps' admitted error.  Lastly, we are mindful of the need for the Corps to reach a decision as soon as is reasonably practicable.  Our view is that one year should be sufficient for the Corps to fully reconsider the reasoning espoused in its 2012 NWP 21 Decision Document.  Cf. In re: MDL-1824 Tri-State Water Rights Litig., 644 F.3d 1160, 1205 (11th Cir. 2011) (per curiam) (imposing a one-year time frame "[g]iven the importance of [the] case, the length of time it ha[d] been bouncing

around the federal courts, and the amount of resources the parties and the courts ha[d] already expended").

V.

Accordingly, we hold that the district court correctly determined that Riverkeeper has standing to sue under the Administrative Procedure Act, but that the district court abused its discretion in concluding that Riverkeeper's suit was barred by laches. Finally, we reverse the district court's judgment on the merits, in light of the Corps' belated admission of error, and remand for reconsideration of the Corps' new CWA and NEPA determinations.

**AFFIRMED in part, REVERSED in part, and REMANDED with instructions.**

TOTENBERG, District Judge, concurring in part and dissenting in part:

I agree with much of the Majority's opinion, including its determinations that Plaintiffs-Appellants have Article III standing to sue the Army Corps of Engineers and that the District Court erred in barring this suit on the equitable basis of laches. To that extent, I concur in the Majority opinion. But I respectfully dissent from the Majority's decision to remand without vacatur based on its determination that "we cannot say that the Corps' ultimate conclusion — that NWP 21 will have minimal effects — was unlawful." I think the significance of the Corps' error is plainly discernible from counsel's argument and the statutory and regulatory requirements governing the issuance of nationwide permits.[1]

The underestimation of the actual impacts to the waters of the United States is central to the issue of whether the Corps' minimal impacts determination was "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Corps' issuance of NWP 21 based on its admitted failure to "fully take into account the potential impacts of the activities authorized by NWP 21(a) [the grandfather provision in dispute on this appeal] when concluding that the impacts of NWP 21 would be minimal" violated § 404 of the Clean Water Act

---

[1] Oral argument on this issue was particularly revealing, more so than the supplemental briefing filed by the Corps, which glossed over the import and magnitude of the error as potentially harmless.

("CWA").[2]  See 33 U.S.C. § 1344.  Under § 404 of the CWA, the Army Corps is

authorized to issue a general permit only if the regulated activities are "similar in

nature, will cause only minimal adverse environmental effects when performed

separately, and will have only minimal cumulative adverse effect on the

environment."  33 U.S.C. § 1344(e)(1); accord 40 C.F.R. § 230.7(a).  The 404(b)

Guidelines require the Corps to predict cumulative effects by evaluating the

number of individual discharges of dredged or fill material into waters of the

United States expected to be authorized by the general permit until it expires.  See

---

[2] The Corps' decision based on this error also violates the National Environmental Policy Act (NEPA) which "require[s] that agencies take a 'hard look' at environmental consequences." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (internal quotation marks omitted).  In determining an agency's compliance with NEPA, reviewing courts must "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc., 462 U.S. 87, 97–98 (1983); see also Robertson, 490 U.S. at 350.  The NEPA regulations require that environmental assessments consider the "environmental impacts of the proposed action and alternatives," including "cumulative impact."  See 40 C.F.R. §§ 1508.7-1508.9(b).  While it is true that the Court may not know the exact scope of the Corps' error, it is crystal clear that the Corps failed to include reauthorized projects in its impacts analysis as required by 40 C.F.R. § 1508.7.  The Court therefore has a duty to set aside the Corps' action when it evades its NEPA obligation to "adequately consider[] and disclose[] the environmental impact of its actions."  Balt. Gas & Elec. Co., 462 U.S. at 98.  Because the Corps failed to comply with the NEPA regulations' requirements, I would vacate the Corps' reauthorization of NWP 21 as arbitrary and capricious pursuant to 5 U.S.C. § 706(2)(A).  See Ala. Envtl. Council v. Adm'r, U.S.E.P.A., 711 F.3d 1277, 1292 (11th Cir. 2013) (setting aside Environmental Protection Agency's action because it was not conducted according to the statutory procedures set forth in the Clean Air Act); see also Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009) discussed infra.

40 C.F.R. § 230.7(b)(3); see also 77 Fed. Reg. 10,206.  The minimal impacts analysis "must be completed before any General permit is issued."  40 C.F.R. 230.7(b).  "Under the CWA, the issuance of a nationwide permit hinges on the reviewing agency's finding that a proposal has only a 'minimal cumulative adverse effect on the environment.'"  Ky. Riverkeeper, Inc. v. Rowlette, 714 F.3d 402, 412 (6th Cir. 2013) (citing 33 U.S.C. § 1344(e)(1) and 40 C.F.R. § 230.7(a)(3)).  Thus, the issuance of a nationwide permit under § 404 based on a faulty and unsupported minimal impacts analysis violates § 404 of the CWA.

The Corps argued in response to Plaintiffs-Appellants' permit challenge below and on appeal that its minimal impacts analysis determined that grandfathered authorizations under paragraph (a) would not have more than minimal cumulative effects "by examining the impacts from those authorizations along with the rest of the activities covered by the 2012 NWP 21," i.e. activities authorized under the new restrictions in paragraph (b).  In light of the error discovered on the eve of oral argument, the Corps has now abandoned that argument as justification for its permit decision.

Counsel for the Corps explained at oral argument the basis for the error and how it occurred here.  As counsel explained, the original proposal for the reissuance of NWP 21 included only the numerical fill limits imposed in paragraph (b) with no grandfather provision, i.e. paragraph (a).  The Corps performed a

survey of its districts to estimate potential impacts under NWP 21 based solely on the authorization of new projects under paragraph (b) and came up with 305 activities resulting in 130 acres.  After the grandfather provision in paragraph (a) was added late in the regulatory permit process,[3] the Corps went back to estimate the number of potential authorizations under paragraph (a) — estimated as 70 projects — but failed to update its prior estimates on the use of the permit based on the original acreage survey.  The error — described by the Corps in its letter as an underestimation of the total number of acres that may be impacted by NWP 21 — is not merely a math error.  The scope of the mistake is much broader.  By failing to take into account that individual activities reauthorized under paragraph (a) each could impact more than a half-acre of waters of the United States because they are not subject to paragraph (b)'s numerical fill limits, the Corps failed to consider the actual impact of reauthorizations issued under paragraph (a)'s grandfather provision in its minimal impacts analysis.  As a result, all reauthorizations issued under paragraph (a) should be suspended.

The Corps' own assertions illustrate why the issuance of NWP 21 based on its faulty minimal impacts analysis is arbitrary, capricious, and unlawful.  At oral argument, the Corps asserted that the nature of the Corps' determination of

_____

[3] The Corps did not include the grandfather provision until after a December 2011 meeting between the Office of Management and Budget and the National Mining Association, after the public comment period on NWP 21 had closed in April 2011.

46

minimal impacts is not reliant on the amount of fill placed in waters of the United

States because the determination relies on the individual verification process and

the use of compensatory mitigation. The Corps' argument runs counter to § 404(e)

of the CWA and the § 404(b) Guidelines, which require the Corps to consider in its

minimal impacts analysis an evaluation of the number of individual discharges of

dredged or fill material into waters of the United States expected to be authorized

by the general permit until it expires. See 40 C.F.R. § 230.7(b)(3). Yet even

reliance on compensatory mitigation as a key component of its minimal impacts

analysis demonstrates why the required analysis must take into account the actual

acreage impacts. As the Corps explained, the basis for its compensatory mitigation

requirement in NWP 21 is to offset impacts to waters by requiring one acre of

mitigation for every acre filled.[4] The Corps' argument is also belied by the very

terms of the general permit which imposes the new ½-acre and 300 linear foot fill

limits as "necessary to ensure that NWP[21] authorizes only those activities that

have minimal individual and cumulative adverse effects on the aquatic

---

[4] The efficacy of mitigation, however, is not based solely on consideration of the number of acres impacted by permitted activities. The 2008 Compensatory Mitigation Rule, in effect since June 9, 2008, provides that for impacts authorized under § 404, compensatory mitigation is not considered until after all appropriate and practicable steps have been taken to first avoid and then minimize adverse impacts to the aquatic ecosystem pursuant to the CWA § 404(b) Guidelines. 43 Fed. Reg. 19,594; see 40 C.F.R. §§ 230.91 et seq. "The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by [Army Corps] permits." 40 C.F.R. § 230.93(a)(1). The determination of the necessary compensatory mitigation is based on a host of different factors. See 40 C.F.R. § 230.93.

environment." As the Corps explained in the Decision Document, "[t]he new acreage and linear foot limits will ensure that this NWP contributes no more than minimal individual and cumulative adverse effects to the aquatic environment, by limiting the amount of waters of the United States that can be filled by each NWP 21 activity."

In response to Plaintiffs-Appellants' arguments that the Court should consider its differential treatment argument, the Corps in its supplemental briefing asserts that whether fill activities authorized under paragraph (a) "will have a minimal cumulative impact given the required compensatory mitigation is a question that necessarily turns on the underlying facts regarding the number of projects each paragraph will authorize" and that "the projected impacts under the two paragraphs must be combined and analyzed cumulatively to determine the full impact of the permit." The Corps describes these factual projections as an integral component of the cumulative impacts analysis. The Corps' error and subsequent argument illustrate that the minimal impacts analysis was based entirely on the projected impacts of authorizations issued under paragraph (b)'s new fill limitations and failed to account for impacts from projects reauthorized under paragraph (a) that are not subject to any fill limits.

The Corps' issuance of the permit under these circumstances is the precise type of agency action subject to the Administrative Procedures Act's ("APA")

arbitrary and capricious standard.  See 5 U.S.C.A. § 706(2)(A) (compelling the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  An agency action is arbitrary and capricious:

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009) (quoting Ala.–Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1254 (11th Cir. 2007)).  The Corps "entirely failed to consider an important aspect of the problem," — the impacts of reauthorizations under the grandfather provision in its cumulative impacts analysis.  Id.  The Corps "offered an explanation for its decision that runs counter to the evidence before the agency" by underestimating — or in reality not individually assessing — the impacts to waters of the United States in its minimal impacts analysis.  Id.  Agency decisions should be set aside under the APA's arbitrary and capricious standard "for substantial procedural or substantive reasons as mandated by statute."  N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538-39 (11th Cir. 1990) (quoting Vt. Yankee Nuclear Power

Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 558 (1978)).  As no actual impact analysis was performed by the Corps prior to its authorization of projects pursuant to the grandfather provision in NWP 21(a), this Court should suspend the 41 reauthorizations issued by the Corps under NWP 21(a) at least until the Corps actually performs the required analysis.[5]

Contrary to the Intervenors' doomsday assertions, suspension or vacatur of NWP 21 would not result in the halting of all mining operations in the Black Warrior River watershed.  NWP 21 is not a mining permit; it is a permit authorizing certain stream filling activities in association with mining operations. Intervenors can operate and conduct stream filling activities associated with their mining operations under the new restrictions in NWP 21(b) or they can seek individual permits under § 404 as contemplated and recognized by the Corps' Decision Document.  The Corps expressly "acknowledge[d] that reissuing NWP 21 with a ½-acre limit, a 300 linear foot limit for the loss of stream bed, and not authorizing discharges of dredged or fill material into waters of the United States to construct valley fills, will result in more surface coal mining activities requiring Clean Water Act Section 404 individual permits."  Otherwise, allowing projects to

---

[5] The Corps' request for remand to the agency without vacatur so that it can perform the analysis that was required of it prior to the issuance of the general permit presents "a cart before the horse" problem.  In its issuance of NWP 21, the Corps assumed there were no more than minimal cumulative or individual impacts without consideration of an essential component of the data analysis, and now argues we should presume no environmental harm after nearly three years of authorized filling activities allowed by dint of the agency's clear error.

50

proceed pursuant to reauthorizations issued under paragraph (a) violates the very substance of § 404(e) of the CWA.[6]

At a minimum, the District Court on remand should suspend all authorizations for those projects for which no filling activities have yet to begin. In the proceedings before the district court below, Intervenors offered specific evidence as to mining operations at only 22 out of the 41 mines authorized under NWP 21(a) in the Black Warrior River watershed. As pointed out in Plaintiffs-Appellants' underlying briefs and confirmed by counsel for Intervenors at oral argument, a good number of the mines reauthorized under NWP 21(a) are either idle or have not yet begun filling activities in the permitted area. Thus, no viable argument can be made that vacatur would have disruptive effects on mines that are either not operating or have not yet begun filling activities pursuant to their reauthorizations.

For these reasons, I respectfully dissent in part.

---

[6] It is noteworthy that many of the cases from the United States Court of Appeals for the District of Columbia Circuit (involving environmental administrative challenges) that decline to grant vacatur after engaging in a balancing of the equities arise in contexts where the agency's enforcement of environmental protections pending remand is consistent with the statutory goals at issue as opposed to the circumstances presented in this case where filling activities will be allowed to continue. See North Carolina v. EPA, 550 F.3d 1176, 1177-78 (D.C. Cir. 2008); Ne. Md. Waste Disposal Auth. v. EPA, 358 F.3d 936, 939 (D.C. Cir. 2004).

51