[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14745

_____

D.C. Docket No. 2:13-cv-02136-WMA

BLACK WARRIOR RIVERKEEPER, INC.,
DEFENDERS OF WILDLIFE,

                                        Plaintiffs - Appellants,

versus

U.S ARMY CORPS OF ENGINEERS,
LT GENERAL THOMAS P. BOSTICK,
U.S. Army Corps of Engineers,
COL. JON CHYTKA,
U.S. Army Corps of Engineers, Mobile District,

                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____
(August 12, 2016)

Before TJOFLAT and MARCUS, Circuit Judges, and STEELE,[*] District Judge.

_____

[*] Honorable John E. Steele, United States District Judge for the Middle District of
Florida, sitting by designation.

MARCUS, Circuit Judge:

In this appeal, we consider -- for the second time -- whether the United States Army Corps of Engineers' ("Corps") 2012 decision to reissue Nationwide Permit 21 ("NWP 21"), a general permit regulating discharge of dredged or fill materials into navigable waters by surface coal mining operations, was arbitrary and capricious. Under Section 404 of the Clean Water Act ("CWA"), the Corps may authorize the discharge of fill materials into navigable waters of the United States by issuing a "general permit" only if those activities will result in minimal individual and cumulative adverse effect on the aquatic environment. See 33 U.S.C. § 1344(e)(1). And the National Environmental Policy Act ("NEPA") requires that federal agencies evaluate whether their proposed actions are likely to have a significant impact on the environment. See 42 U.S.C. § 4332. The 2012 NWP 21 imposes strict discharge limits on all new surface mining activities, but grandfathers in activities approved under a previous iteration of NWP 21 so long as they do not exceed previously approved discharge levels and meet other conditions imposed by a regional Corps official. At the headwaters of this litigation, Black Warrior Riverkeeper, Inc., and Defenders of Wildlife (collectively "Riverkeeper"), two concerned environmental groups, filed suit under the Administrative Procedure Act, 5 U.S.C. § 706, claiming that the Corps' decision to reissue NWP

21, as well as its environmental impact findings under the CWA and NEPA, were arbitrary and capricious.

The first time around, the district court granted summary judgment to the Corps and Riverkeeper appealed. However, on the eve of oral argument, the Corps admitted that it had failed to consider certain important information in reaching its decision, so we remanded the case to the district court, which in turn remanded it to the Corps for further review. After considering the omitted data, the Corps reaffirmed its decision to issue NWP 21. Riverkeeper renewed its challenges, and the district court once again granted final summary judgment in favor of the Corps. Riverkeeper again appeals, arguing that the Corps' decision to treat new and old activities differently can't hold water. After thorough review and with the benefit of oral argument, we affirm.

## I.

## A.

As we explained the first time we heard this case, see Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs., 781 F.3d 1271, 1275–78 (11th Cir. 2015), Riverkeeper's challenge involves several complex statutory and regulatory schemes designed, in substantial measure, to ensure that federal agencies conduct a thorough assessment of the environmental impacts of their proposed actions. The Clean Water Act prohibits the "discharge of any pollutant"

3

into "navigable waters" unless in compliance with specified provisions of the Act. 33 U.S.C. §§ 1311(a), 1344(a); see also U.S. Army Corps of Eng'rs. v. Hawks Co., Inc., 136 S. Ct. 1807, 1811 (2016).  "Pollutant" includes "rock" and "sand," 33 U.S.C. § 1362(6), and "[n]avigable waters" encompass all "waters of the United States," id. § 1362(7).  Despite the CWA's general prohibition on the discharge of pollutants, Section 404 of the Act expressly authorizes the Secretary of the Army, through the Corps, to regulate discharges of dredged or fill material -- a subset of "pollutants" -- into waters of the United States through the issuance of permits. See 33 U.S.C. § 1344.  These permits can take the form of either individual permits, § 1344(a), or general permits, which authorize certain categories of discharges on a state, regional, or nationwide basis, § 1344(e).

The Corps reviews "individual" permit applications on a case-by-case basis under Section 404(a).  Id. § 1344(a).  Individual permits may be issued or denied after a review involving, among other things, site-specific documentation and analysis, opportunity for public hearing, public interest review, and a formal determination that the permit is lawful and warranted.  See 33 C.F.R. § 323.3 (specifying activities requiring permits); 33 C.F.R. pts. 320, 323, 325 (policies and procedures for permit processing).  Issuing an individual permit "requires a resource-intensive review that entails submission of voluminous application materials, extensive site-specific research and documentation, promulgation of

4

public notice, opportunity for public comment, consultation with other federal agencies, and a formal analysis justifying the ultimate decision to issue or refuse the permit." Crutchfield v. County of Hanover, 325 F.3d 211, 214 (4th Cir. 2003).

To avoid the burden of individual permit evaluations, Congress authorized the Corps to issue general permits to cover categories of discharges that, as a group, have only minimal impacts on the waters of the United States. H.R. Rep. No. 95-830, at 98 (1977). General permits may be issued "on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material" by the Corps' Chief of Engineers or a District Engineer, which is a regional official, but only after an extensive administrative process and analysis at the national or regional level. 33 U.S.C. § 1344(e)(1). Before issuing a general permit, then, the Corps must provide public notice and an opportunity for a hearing. Id. And before it can be issued, the Corps must determine that the proposed general permit meets three conditions: the activities authorized by the permit must (1) be "similar in nature," (2) cause only "minimal adverse environmental effects when performed separately," and (3) "have only minimal cumulative adverse effect on the environment." Id. In determining whether the environmental effects of a general permit will be minimal, the Corps must consider a range of factors relating to the impact of discharges on aquatic ecosystems and the humans who use them, and must then document the environmental effects of

5

the activities authorized by the permit in a decision document. See 40 C.F.R. pt. 230 (2014).

After performing this evaluation, the Corps must make a written determination of the effects of a proposed activity "on the physical, chemical, and biological components of the aquatic environment." 40 C.F.R. § 230.11. The decision document must provide specific documentation showing that each of the § 1344(e) conditions has been met, and the evaluation "must be completed before any General permit is issued." See 40 C.F.R. § 230.7(b).

The Corps is also required to comply with the National Environmental Policy Act. NEPA serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to members of the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). NEPA's mandate to agencies is "essentially procedural . . . . It is to insure a fully informed and well-considered decision . . . ." Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 558 (1978). Thus, "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." Robertson, 490 U.S. at 350. NEPA requires federal agencies to prepare an Environmental Impact Statement for any "major Federal action[]

6

significantly affecting the quality of the human environment," which can include nationwide permits issued by the Corps.  42 U.S.C. § 4332(2)(C); 33 C.F.R. § 330.5(b)(3).  The agency first prepares an Environmental Assessment, which is essentially a preliminary account of the environmental effects of a proposed action.  See 40 C.F.R. §§ 1501.4, 1508.9.  If the Environmental Assessment suggests that the effects of the action are likely to be significant, the agency must issue the more detailed Environmental Impact Statement.  See id. § 1501.4(c).  Otherwise, it issues a Finding of No Significant Impact.  Id. § 1501.4(e).

**B.**

This case involves a challenge to Nationwide Permit 21 ("NWP 21"), a general permit issued by the Corps.  On February 21, 2012, after affording the public the opportunity to participate in an administrative process that included notice and comment, the Corps issued fifty nationwide permits, including NWP 21.  Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184 (Feb. 21, 2012).  NWP 21 authorizes "[d]ischarges of dredged or fill material into waters of the United States associated with surface coal mining and reclamation operations."  Id. at 10,274.

Surface coal mining involves the discharge of dredged or fill material in a variety of ways.  To reach underground coal seams, surface mining operations must dig through and remove a mixture of soil, rock, and coal residue commonly referred to as "overburden," which is replaced once the coal has been extracted.

7

Excess overburden must be deposited somewhere else -- occasionally filling or burying streams, or in the form of a much larger "valley fill," which is exactly what it sounds like.  In other cases, the coal seam runs underneath the stream itself, and the operation will "mine through" the stream.  Mining operations also generate and discharge material when they create sediment ponds and build roads, processing plants, and other mining infrastructure.  As a result of the mining process, drainage from the mining site, which contains substantial amounts of sediment, salt, and metals, can seep into and contaminate larger waterways.  This runoff may continue for decades after the mine has closed.  The discharge of dredged or fill material, therefore, may have consequences for water quality and the health of aquatic ecosystems throughout the entire watershed.

The Corps has long struggled to ensure that the environmental impacts of surface mining operations are minimal.  Nationwide Permit 21 was first issued in 1982, see Interim Final Rule for Regulatory Programs of the Corps of Engineers, 47 Fed. Reg. 31,794, 31,833 (July 22, 1982), and has subsequently been amended and reissued many times.  The 2007 version did not place any limits on the length of streams that could be filled by authorized activities.  See Reissuance of Nationwide Permits, 72 Fed. Reg. 11,092, 11,184 (Mar. 12, 2007).  The Corps eventually became concerned that activities authorized by NWP 21 were resulting in greater environmental impacts than anticipated, and it suspended NWP 21 in six

8

states in the Appalachian Region in 2010: Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia. See Suspension of Nationwide Permit 21, 75 Fed. Reg. 34,711, 34,712 (June 18, 2010). The Corps did not suspend NWP 21 in Alabama, although the Environmental Protection Agency subsequently stated in a letter to the Corps that "the same concerns and science that brought about the six state suspension appl[y] to the coal fields of Alabama." The 2007 NWP 21 expired on March 18, 2012. Reissuance of Nationwide Permits, 72 Fed. Reg. at 11,092.

In 2012, the Corps adopted a new course intended, in part, to "address[] the concern that led to [its] previous suspension of NWP 21 in the six Appalachian states." Reissuance of Nationwide Permits, 77 Fed. Reg. at 10,205. During the notice and comment period, the Corps proposed three options for reauthorizing NWP 21 after its expiration:

> The first option was not to reissue NWP 21 and to let it expire on March 18, 2012. . . . Option 2 was to reissue NWP 21 with a ½-acre limit, including a 300 linear foot limit for the loss of stream bed. Under Option 2, NWP 21 would not authorizes discharges of . . . valley fills. . . . Option 3 was similar to Option 2, but under Option 3 NWP 21 could authorize discharges of . . . valley fills.

In 2012, the Corps "selected Option 2 for the reissuance of NWP 21, and [] made some additional modifications to reduce hardships on permittees who previously obtained authorization under the NWP 21 issued on March 12, 2007, and invested substantial resources in reliance on that NWP authorization."

As a result, the 2012 version of NWP 21, which authorized stream-filling operations for an additional five years, consisted largely of two new provisions.[1]

---

[1] The full text of the 2012 NWP 21 provides:

21. Surface Coal Mining Activities. Discharges of dredged or fill material into waters of the United States associated with surface coal mining and reclamation operations.

(a) Previously Authorized Surface Coal Mining Activities. Surface coal mining activities that were previously authorized by the NWP 21 issued on March 12, 2007 (see 72 FR 11092), are authorized by this NWP, provided the following criteria are met:

(1) The activities are already authorized, or are currently being processed by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977 or as part of an integrated permit processing procedure by the Department of Interior, Office of Surface Mining Reclamation and Enforcement;

(2) The permittee must submit a letter to the district engineer requesting re-verification of the NWP 21 authorization. The letter must describe any changes from the previous NWP 21 verification. The letter must be submitted to the district engineer by February 1, 2013;

(3) The loss of waters of the United States is not greater than the loss of waters of the United States previously verified by the district engineer under the NWP 21 issued on March 12, 2007 (i.e., there are no proposed expansions of surface coal mining activities in waters of the United States);

(4) The district engineer provides written verification that those activities will result in minimal individual and cumulative adverse effects and are authorized by NWP 21, including currently applicable regional conditions and any activity-specific conditions added to the NWP authorization by the district engineer, such as compensatory mitigation requirements; and

(5) If the permittee does not receive a written verification from the district engineer prior to March 18, 2013, the permittee must cease all activities until such verification is received. The district engineer may extend the February 1, 2013, deadline by so notifying the permittee in writing, but the permittee must still cease all activities if he or she has

(continued on next page)

10

First, paragraph (a), which functions as a grandfathering provision, allows for the

reauthorization of operations that were previously authorized under the 2007 NWP

21, subject to verification by a district engineer that the activity will not impact

more waters than previously authorized under the 2007 NWP, will continue to

cause only minimal individual and cumulative adverse effects, and will comply

> > not received written verification from the Corps by March 18, 2013, until such verification is received.
>
> (b) Other Surface Coal Mining Activities. Surface coal mining activities that were not previously authorized by the NWP 21 issued on March 12, 2007, are authorized by this NWP, provided the following criteria are met:
>
> > (1) The activities are already authorized, or are currently being processed by states with approved programs under Title V of the Surface Mining Control and Reclamation Act of 1977 or as part of an integrated permit processing procedure by the Department of Interior, Office of Surface Mining Reclamation and Enforcement;
> >
> > (2) The discharge must not cause the loss of greater than ½-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed, unless for intermittent and ephemeral stream beds the district engineer waives the 300 linear foot limit by making a written determination concluding that the discharge will result in minimal individual and cumulative adverse effects. This NWP does not authorize discharges into tidal waters or non-tidal wetlands adjacent to tidal waters; and
> >
> > (3) The discharge is not associated with the construction of valley fills. A "valley fill" is a fill structure that is typically constructed within valleys associated with steep, mountainous terrain, associated with surface coal mining activities.
>
> Notification: For activities under paragraph (b) of this NWP, the permittee must submit a pre-construction notification to the district engineer and receive written authorization prior to commencing the activity. (See general condition 31.) (Sections 10 and 404)

Reissuance of Nationwide Permits, 77 Fed. Reg. at 10,274.

with any additional activity-specific conditions that the district engineer deems appropriate, such as compensatory mitigation.[2] Id. at 10,274.  As for new operations, paragraph (b) adds several specific limits on stream-filling activity, including a requirement that discharges "must not cause the loss of greater than ½-acre of non-tidal waters of the United States, including the loss of no more than 300 linear feet of stream bed." Id.  Permitted activities under 21(b) also may not involve the construction of valley fills. Id.  The new limits provided by paragraph (b) do not apply to grandfathered reauthorizations under paragraph (a) -- and that disparate treatment forms the crux of the Riverkeeper's challenge in this case.

Along with the revised permit, the Corps issued a sixty-four page Decision Document explaining the rationale behind its revisions, which included the Corps' Clean Water Act and National Environmental Policy Act analyses.  Specifically, the Corps estimated that, in total, NWP 21 would be used approximately 61 times per year on a national basis, resulting in impacts to approximately 26 acres of waters of the United States, and requiring approximately 62 acres of compensatory mitigation to offset the impacts.  The Corps concluded, as required by the CWA,

---

[2] Compensatory mitigation "involves actions taken to offset unavoidable adverse impacts to wetlands, streams and other aquatic resources authorized by Clean Water Act section 404 permits and other aquatic resources authorized by Clean Water Act section 404 permits." Compensatory Mitigation for Losses of Aquatic Resources, 73 FR 19594-01, 19594 (April 10, 2008).  "Compensatory mitigation can be carried out through four methods: the restoration of a previously-existing wetland or other aquatic site, the enhancement of an existing aquatic site's functions, the establishment (i.e., creation) of a new aquatic site, or the preservation of an existing aquatic site." Id.

12

that activities authorized by NWP 21 would not have more than minimal cumulative adverse effect on the environment. It also concluded, pursuant to NEPA, that NWP 21 would not significantly affect the environment, and that an Environmental Impact Statement would therefore not be required. Certain portions of the Decision Document suggested that the limitations imposed on new authorizations under paragraph 21(b) were "necessary to constrain the adverse effects to the aquatic environment, to ensure compliance with the statutory requirement that general permits, including NWPs, may only authorize those activities that have minimal individual and cumulative adverse effects on the aquatic environment."

## C.

Riverkeeper is an environmentalist group whose members use waters of the Black Warrior River watershed, in west-central Alabama, that flow downstream from mining sites authorized to discharge material under NWP 21. According to Riverkeeper, these projects have had a profound effect on the quality of the waters within the Black Warrior River watershed. Its members have observed, for example, that waters downstream from mining sites are discolored and clouded with sediment and silt. Impaired water quality, they claim, has "decrease[d] [their] aesthetic and recreational enjoyment, reduce[d] their opportunities to observe wildlife, and cause[d] them concern about ingesting the water and fish caught in

13

the water." To take just one example, Riverkeeper alleges that several coal mines permitted under NWP 21(a) ultimately drain into the Locust Fork of the Black Warrior River, near Birmingham, releasing sedimentation, solids, and chemical compounds. Riverkeeper fears that what it calls the resulting "dirty or polluted water" will deter its members and others from using the river for recreation -- the Locust Fork is one of the most popular whitewater paddling locations in the state -- as well as harm local wildlife.

In order to block the forty-one reauthorizations granted by the Corps pursuant to NWP 21(a) and therefore avert further claimed environmental damage, Riverkeeper filed this lawsuit in the United States District Court for the Northern District of Alabama on November 25, 2013, against the Corps and several Corps officials. The gravamen of Riverkeeper's complaint is that it was contradictory for the Corps to impose stringent stream-fill limits on new operations, but, at the same time, decline to apply those very same limits to operations previously authorized by the 2007 NWP 21 and subsequently reauthorized by the 2012 version. To put it slightly differently, Riverkeeper's argument is that the Corps could not rationally have found (as the Decision Document suggested) that these new limits were "necessary" to avoid significant environmental impacts, and then conclude regardless that the impacts of grandfathered projects would be minimal. Specifically, Riverkeeper's complaint raised four counts: (1) paragraph (a) of NWP

14

21, in effect, amounts to an unlawful ten-year permit term, in violation of 33 U.S.C. § 1344(e)(2); (2) the Corps' cumulative effects analysis under the CWA was arbitrary and capricious, in violation of 5 U.S.C. § 706 and 33 U.S.C. § 1344(e)(1); (3) the Corps' issuance of reauthorizations in the Black Warrior River watershed pursuant to NWP 21 was arbitrary and capricious, in violation of 5 U.S.C. § 706 and 33 U.S.C. § 1344(e)(1); and (4) the Corps' Finding of No Significant Impact under NEPA was arbitrary and capricious, in violation of 5 U.S.C. § 706 and 42 U.S.C. § 4332(c).

Eight days after it initiated this suit, Riverkeeper moved for a preliminary injunction to suspend all reauthorizations in the Black Warrior River watershed. On December 23, 2013, the Alabama Coal Association and several mining companies -- MS & R Equipment Co., Inc., Reed Minerals, Inc., Twin Pines, LLC, and Walter Minerals, Inc. -- moved to intervene, citing the harm that Riverkeeper's requested injunction would cause to their mining operations. Their motion to intervene was granted without objection from Riverkeeper. At a February 2014 hearing on Riverkeeper's motion for a preliminary injunction, the district court refused to hear any argument on the merits because Riverkeeper could not post a $300,000 bond. The district court denied Riverkeeper's motion on February 18. Riverkeeper then moved for summary judgment on February 20. At a hearing on March 3, Riverkeeper voluntarily dismissed Count 3 of its complaint, claiming that

15

it was no longer directly challenging the forty-one reauthorizations.  On April 2, the Corps filed a cross-motion for summary judgment, addressing the merits; a week later, the Intervenors filed their motion to dismiss or for summary judgment, addressing the merits as well as standing and laches.

Ultimately, the district court concluded that Riverkeeper had standing under Article III of the U.S. Constitution and the Administrative Procedure Act to mount this lawsuit, but that its claims were barred by the doctrine of laches, and, in any event, failed on the merits.  The district court rejected the Intervenors' argument that Riverkeeper lacks standing to challenge a permit under § 404 because Riverkeeper's injuries, which flow from diminished downstream water quality, were cognizable under § 404 and traceable to NWP 21.  The district court did, however, decide that Riverkeeper's delay in commencing this lawsuit was inexcusable, and that the Intervenors suffered palpable prejudice because they acted in reliance on reauthorizations granted under NWP 21.  Finally, the district court concluded that the Corps did not act arbitrarily and capriciously in concluding that NWP 21 would have no more than minimal cumulative adverse effect on the environment.  Riverkeeper timely appealed to this Court.

On March 23, 2015, a panel of this Court vacated the district court's decision.  See Black Warrior Riverkeeper, 781 F.3d at 1292.  It agreed with the district court that the plaintiffs had standing to pursue both its Clean Water Act and

National Environmental Policy Act claims challenging the reissuance of NWP 21.

Id. at 1283.  But it found that the district court had abused its discretion in finding

that the plaintiffs' suit was barred by laches, both because they had shown

adequate excuse for their delay in filing suit and because their delay did not

prejudice the defendants or intervenors.  Id. at 1284-85, 1287.

Turning to the merits, the panel explained that Riverkeeper challenged only

a single error of the Corps' reasoning, which it called the "differential treatment

error."  Id. at 1288. In short, Riverkeeper argued that "it was arbitrary and

capricious for the Corps to conclude, on the one hand, that the new stream-fill

limits contained in paragraph (b) of NWP 21 are necessary to avoid significant

environmental effects, but on the other, to decline to apply them to projects

reauthorized pursuant to paragraph (a)."  Id.  However, the panel concluded  that it

could not resolve the merits of the suit because "the Corps admitted on the eve of

oral argument that it underestimated the number of acres of waters that may be

impacted by NWP 21."  Id. at 1288.  Specifically, the Corps had failed to "take

into account that activities re-verified under paragraph (a)" -- the grandfathered-in

activities that were not subject to the new limitations imposed by paragraph 21(b) -

- "could impact more than a half-acre of waters of the United States."  Id.  On this

murky record, the Court could not discern whether the Corps' error was "truly

significant" and whether the Corps' "ultimate conclusion -- that NWP 21 will have

17

minimal effects -- was unlawful." Id.  The panel declined to vacate NWP 21, concluding that vacatur was not mandatory and that it had the equitable discretion to remand the matter to the Corps without vacating the agency's action.  Id. at 1289.  However, viewing the undeveloped record, the panel could not decide in which direction the equities tipped.  Id. at 1291.  Therefore, the panel vacated the district court's decision and remanded with instructions to the district court to remand the case to the Corps with a one-year time limit to reconsider its decision, and to determine whether any further relief, including vacatur, was required in light of the Corps' admitted error.  Id.[3]

### D.

The district court sent the case back upstream to the Corps "for a thorough reevaluation of the Corps' CWA and NEPA determinations in light of all of the relevant data, including the Corps' recalculated figure for the acreage of waters affected by NWP 21."  It ordered that the reevaluation be accomplished within a year and stayed the case pending completion of the reevaluation.  But the district court declined to vacate NWP 21 pending reevaluation because the reevaluation would take less than a year and there was "no indication that intervenors intend to

---

[3] U.S. District Judge Totenberg agreed with the Court on standing and laches, but thought that the Corps' confessed error was so significant as to require vacatur of NWP 21.  Black Warrior Riverkeeper, 781 F.3d at 1292 (Totenberg, J., concurring in part and dissenting in part).

18

perform material alterations to the subject water quality while the reconsideration is ongoing."

Six weeks later, on August 7, 2015, the Corps submitted a Revised Decision Document to the district court. The Revised Decision Document did not result in any changes to NWP 21, but did provide an updated analysis of the impacts of the permit. It analyzed the actual impact of paragraph (a), which was the flaw that the Corps had confessed to on the eve of oral argument. Because paragraph (a) required new verifications of the previously authorized projects to issue before March 18, 2013, a date which had long passed by the time the Revised Decision Document was drafted, the Corps was able to provide an estimate of environmental impact that encompassed all of the NWP 21(a) verifications that could be issued. In all, 88 verifications were issued under 21(a), with impacts to approximately 503 acres and 280,700 linear feet of waters of the United States. To offset those impacts, the Corps required compensatory mitigation of approximately 653 acres and 377,300 linear feet. The Corps determined that 21(b) would be used approximately 7 times per year nationwide, resulting (over the life of the permit) in impacts to approximately 6.5 acres and 17,000 linear feet of waters of the United States, and requiring 11.5 acres and 21,000 linear feet of compensatory mitigation to offset the impacts. Thus, on average, each of the 21(a) authorizations impacts

19

nearly 6 acres and 3,200 linear feet of waters of the United States (in comparison with the ½-acre and 300 linear feet limits imposed on all 21(b) authorizations).

The Revised Decision Document contained essentially the same statements on which the Riverkeeper's "differential treatment error" argument had been based. For example, it states that the acreage and linear foot limits in NWP 21(b) "are <u>necessary</u> to constrain the adverse effects to the aquatic environment to ensure compliance with the statutory requirement that general permits, including NWPs, may only authorize those activities that have minimal individual and cumulative adverse effects on the aquatic environment." It also provides that "[t]he new acreage and linear foot limits will ensure that this NWP contributes no more than minimal individual and cumulative adverse effects to the aquatic environment," and that "[t]he Corps has determined that the changes to NWP 21 are necessary to comply with the requirements of Section 404(e) of the Clean Water Act."

The Corps' overall findings were not affected by its adjustment to the impact of 21(a). It concluded, as required by the CWA, that "despite the higher impact and compensatory mitigation amounts expected to occur across the country during the five year period this NWP is in effect, . . . the individual and cumulative adverse effects on the aquatic environment resulting from the activities authorized by this NWP will be minimal." The Corps also made a "Finding of No Significant Impact" under NEPA.

After reviewing the Revised Decision Document, the parties renewed their cross-motions for summary judgment.   The district court again granted the Corps' motion for summary judgment and denied the plaintiffs' motion for summary judgment.  It noted that Riverkeeper raised the same "differential treatment error" argument based on language in the Revised Decision Document that is indistinguishably similar to the language it relied on in the original decision document.  The court rejected that argument because it determined that statements in the Revised Decision Document that the changes to NWP 21 were "necessary" to ensure minimal environmental impact logically referred to all changes and all new terms and conditions, not just the changes in 21(b).  Moreover, the district court determined that the Corps took a hard look at the entire record before reaching its CWA and NEPA determinations, and that the decision to treat grandfathered-in permits under 21(a) differently than new permits under 21(b) was not arbitrary and capricious because the Corps considered the permit as a whole in making its finding of no significant impact.

Riverkeeper timely appealed to this Court for the second time.

## II.

"We review the district court's decision to grant summary judgment to the Corps and the Intervenors on the merits de novo, while applying the appropriate standard of review to the agency's decision."  Black Warrior Riverkeeper, 781

21

F.3d at 1288.  We review the Corps' permitting decisions, as well as its Finding of No Significant Impact and decision not to prepare an Environmental Impact Statement pursuant to NEPA, under the Administrative Procedure Act's arbitrary and capricious standard.  Black Warrior Riverkeeper, 781 F.3d at 1288.  Under the Administrative Procedure Act, we must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  The arbitrary and capricious standard is a highly deferential one, and we cannot substitute our judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained.  Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008).  Our inquiry is limited by law to whether the agency's decision was based on a consideration of the relevant factors and, ultimately, whether it made a clear error of judgment.  Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996).  Our deference extends both to an agency's ultimate findings as well as "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue."  Van Antwerp, 526 F.3d at 1361.  While we should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), "[w]e may not supply a reasoned

basis for the agency's action that the agency itself has not given," <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).

Our task ultimately is to "ensure that the agency took a 'hard look' at the environmental consequences of the proposed action." <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 295 F.3d 1209, 1216 (11th Cir. 2002). An agency has satisfied the "hard look" requirement <u>if</u> it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>Id.</u> (quotation marks omitted).

## III.

## A.

In view of the substantial deference we afford agency action, Riverkeeper faces an upstream swim. It renews its "disparate treatment" argument, contending again that the Corps' CWA and NEPA determinations are arbitrary and capricious because the Corps determined that the new ½-acre and 300 linear-foot limits imposed on permits under 21(b) are necessary to ensure minimal environmental impact, but declined to impose any of those new limitations on the grandfathered-in permits under 21(a).[4] In other words, Riverkeeper says that the activities authorized under 21(a) cannot possibly result in minimal impact to navigable

---

[4] Riverkeeper concedes that the Revised Decision Document fixed the Corps' previous underestimation error that prevented us from reaching the merits the first time around, and agrees that error is no longer a legal issue in the case.

waters because they are not subject to the very limitations that the Corps itself deemed necessary to ensure minimal impact.  It observes that 41 of the 88 authorizations under 21(a) are located in the Black Warrior River Watershed, and those 41 authorizations will allow an additional 25 miles of stream impacts that would not occur if they were subject to the limitations found in 21(b).  Therefore, it asks us to vacate the grandfather provision in NWP 21(a) and all of the authorizations issued thereunder.  Ultimately, we find that Riverkeeper's arguments can't swim against the tide.

For starters, we think that the text of NWP 21(a) goes a long way to supporting the Corps' determination that authorized activities under 21(a) will have minimal individual and cumulative adverse effects.  NWP 21(a) provides that a previously authorized mining activity under the 2007 NWP 21 can only be reauthorized under 21(a) if a district engineer determines that: the activity does not create any greater "loss of waters" than it did under the 2007 permit; the activity "will result in minimal individual and cumulative adverse effects"; and it complies with additional "applicable regional conditions and any activity-specific conditions added to the NWP authorization by the district engineer, such as compensatory mitigation requirements."  Reissuance of Nationwide Permits, 77 Fed. Reg. at 10,274 (emphasis added).  These explicit requirements apply to all 21(a) authorizations and substantially undercut Riverkeeper's argument that the new

21(b) limitations are the only way that the Corps can ensure minimal individual and cumulative adverse environmental effects. On its face, Rule 21(a) expressly requires a district engineer to determine that a grandfathered-in permit will have minimal effects before authorizing it. Riverkeeper has not provided any reason to believe that NWP 21(a) will fail to operate according to its terms, or that the district engineers will abandon the many tasks they are obliged to perform.

In fact, the Revised Decision Document explains that NWP 21(a) will operate exactly as the text suggests it will: "For those previously authorized surface coal mining activities, the district engineer must determine that the activity continues to result in minimal individual and cumulative adverse effects on the aquatic environment." The Revised Decision Document later emphasizes that NWP 21(a) activities must be confirmed by the district engineer to "result[] in minimal individual and cumulative adverse effects on the aquatic environment," and that the district engineer can revise any applicable regional conditions and activity-specific conditions, including compensatory mitigation requirements, "if the existing ones are determined not to be adequate to ensure minimal adverse effects." And, indeed, if the district engineer determines that the cumulative adverse effects of NWP 21-authorized activities are more than minimal in a "specific watershed" (such as the Black Warrior River Watershed), they are authorized to require individual permits or add conditions to the NWP on a case-

25

by-case basis.  Finally, the Revised Decision Document reiterates what the text of NWP 21(a) should make clear: if a previously verified activity is expanded in such a way that it will "result in greater losses of waters of the United States," it cannot be authorized under NWP 21 <u>unless</u> it qualifies under NWP 21(b).  Thus, from the explicit restrictions placed on activities under 21(a), it naturally follows that 21(a) authorizations will have minimal environmental impact.

Moreover, the Corps considered both the 21(a) and (b) authorizations in evaluating whether the permits met the CWA's and NEPA's minimal impact requirements.  The Revised Decision Document makes it abundantly clear throughout that the minimal impact analysis is based on both 21(a) and (b) activities:

> The estimated contribution of this NWP to the cumulative effects to aquatic resources in the United States during the five year period that the NWP would be in effect, in terms of the estimated number of time this NWP would be used until it expires and the projected impacts and compensatory mitigation, is provided in Section 6.2.2.  The activities authorized by this NWP, <u>including the activities authorized under paragraphs (a) and (b) of this NWP</u>, will result in a minor incremental contribution to the cumulative effects that have occurred to wetlands, streams, and other aquatic resources in the United States because, as discussed in this section, they are one of many activities that affect those resources.

The Corps' minimal impact analysis plainly considered data for "<u>all of the NWP 21(a) verifications that could be issued</u> during the period [the 2012] NWP 21 is in effect," which was available at the time of the Revised Decision Document

26

"because the terms of NWP 21(a) state that those verifications should generally be issued on or before March 18, 2013," and the Revised Decision Document was produced in August 2015.  Thus, it seems to us that the Corps considered the relevant factors in performing its environmental impact analysis.

Riverkeeper does not contest the accuracy of the environmental impact estimates provided by the Corps, nor does it explain why the actual acreage impacts of projects under 21(a) -- for which the Corps had confirmed data at the time it drafted the Revised Decision Document -- are more than "minimal" as that term is used in the Clean Water Act.  Rather, it invites us to parse the language of the Revised Decision Document for statements suggesting that 21(b)'s ½-acre and 300 linear-foot limits are the only means of ensuring minimal environmental impact.  As we recounted above, there are a few statements in the Revised Decision Document that suggest that the 21(b) limitations are "necessary" to ensure minimal environmental impacts.  But, under arbitrary and capricious review, we must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc., 419 U.S. at 286.  And we have no trouble discerning that the Corps considered the limitations imposed under both sections of NWP 21, as well as general permit conditions applicable to all NWPs in reaching its environmental impact determinations.

27

In estimating the environmental impact of the new NWP 21, the Corps assessed "individual and cumulative effects" by considering "the terms and limits of the NWP, pre-construction notification requirements,[5] and the standard NWP general conditions." The Revised Decision Document repeatedly states that the Corps' environmental impact determinations were based on both 21(a) and (b) activities and the wide array of means available to limit the impact of activities under both provisions. Specifically, it noted that "the imposition of the ½-acre limit, 300 linear foot limit, and prohibition against authorizing valley fills on activities that were not previously authorized under the 2007 NWP 21, as well as the pre-construction notification requirements and other procedural safeguards, will authorize only those activities with minimal individual and cumulative adverse effects on the aquatic environment." These "other procedural safeguards include the authority for division engineers to modify, suspend, or revoke NWP 21 authorizations on a regional basis, and the authority for district engineers to modify NWP 21 authorizations by adding conditions, such as compensatory mitigation requirements, to ensure minimal individual and cumulative adverse effects on the aquatic environment."

---

[5] Pre-construction notification involves evaluating proposed activities to determine whether they result in minimal individual and cumulative adverse effects on the aquatic environment, and whether compensatory mitigation is needed to comply with the minimal adverse environmental effects requirement for general permits.

28

The Revised Decision Document elaborates that "[c]ompensatory mitigation required for activities verified under the 2007 NWP 21 [i.e., the 2012 grandfathered activities under 21(a)] will continue to be required, and may be augmented if the district engineer determines that they do not adequately compensate for losses of aquatic resource function and ensure minimal adverse effects." In fact, the Corps' ultimate "minimal impact" finding explicitly referenced all of the limits that NWP 21 imposes on permitted activities, not just those contained in 21(a): "Compliance with the terms and conditions of this NWP, including the mitigation general condition (general condition 23), as well as compliance with regional conditions imposed by division engineers and activity-specific conditions added to NWP verifications by district engineers, will ensure that the activities authorized by this NWP will result in no more than minimal individual and cumulative adverse effects on the aquatic environment." Thus, it seems plain to us that the Corps took a hard look at the environmental impact of authorizations under both 21(a) and (b), and determined that the restrictions imposed on each set of authorizations were sufficient to ensure that they result in no more than minimal individual and adverse cumulative effects.

Throughout the Revised Decision Document, the Corps placed special reliance on compensatory mitigation as a means of ensuring minimal net environmental impacts. Riverkeeper criticizes the Corps' reliance on

compensatory mitigation as a "simplistic calculation" based on the erroneous assumption that compensatory mitigation will always fully offset the adverse environmental impacts of dumping surface spoil in streams.[6]  But nothing in the Revised Decision Document suggests that the Corps' relied on compensatory mitigation to <u>fully</u> offset the environmental impacts of permitted activities -- indeed, the Corps' analysis suggests that compensatory mitigation is simply one of many restrictions applicable to 21(a) and (b) authorizations that will help to ensure that NWP 21 authorizations meet statutory requirements.  The Corps candidly conceded in the Revised Decision Document that "it is difficult to assess whether compensatory mitigation has fully or partially offset the lost functions provided by the aquatic resources that are impacted by permitted activities," but determined that so long as its general guidelines are followed, compensatory mitigation "will provide aquatic resource functions and services to offset <u>some or all</u> of the losses of aquatic resource functions caused by the activities by this NWP, and reduce the

---

[6] In <u>Kentucky Riverkeeper, Inc. v. Rowlette</u>, 714 F.3d 402 (6th Cir. 2013), the Sixth Circuit invalidated NWP 21(a) as arbitrary and capricious, <u>id.</u> at 413, because the Corps had failed to comply with its own regulations requiring the Corps to provide <u>analysis or documentation</u> to support its determination that compensatory mitigation will ensure minimal adverse effects, <u>id.</u> at 411 (citing 40 C.F.R. §§ 230.7(b), 230.11).  For the first time in its reply brief, Riverkeeper argued that the Corps' failure to provide adequate documentation in support of its compensatory mitigation analysis ran afoul of 40 C.F.R. § 230.7(b).  However, "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court."  <u>Herring v. Sec'y, Dep't of Corr.</u>, 397 F.3d 1338, 1342 (11th Cir. 2005) (quotation omitted).

contribution of those activities to the cumulative effects on the Nation's wetlands, streams, and other aquatic resources."

Moreover, we must afford the Corps special deference in this area because it "is making predictions, within its area of special expertise, at the frontiers of science . . . as opposed to simple findings of fact." Miccosukee Tribe, 566 F.3d at 1264. As evidenced by the numerous scientific research papers discussed in the Revised Decision Document, the minimum impact analysis involves difficult predictions about how coal mining activities will affect complex ecosystems, and how district engineers will be able to offset those effects through permit-specific requirements and compensatory mitigation. This is not an area where we may easily second-guess the Corps, especially considering that Riverkeeper has not contested any of the Corps' data or even argued that its estimates exceed "minimal" impact as that term is used in the CWA. For all of these reasons, we find that the Corps' environmental impact findings under the CWA and NEPA were not arbitrary and capricious.

## B.

Relatedly, the Riverkeeper claims that the Corps has not articulated a sufficient rationale for treating similar mining activities differently under NWP 21(a) and (b). See Yetman v. Garvey, 261 F.3d 664, 669 (7th Cir. 2001) ("A long line of precedent has established that an agency action is considered arbitrary when

31

the agency has offered insufficient reasons for treating similar cases differently.").
It argues that the only reason for the differential treatment is to alleviate the coal mining companies' financial burden of obtaining individual permits, which Riverkeeper maintains is not a permissible consideration under the Clean Water Act.  We remain unpersuaded.

Riverkeeper is correct that one of the Corps' principal justifications for grandfathering in 21(a) permits was economic hardship to the regulated companies. Indeed, the Revised Decision Document acknowledged that the purpose of including the grandfather provision under 21(a) was "to reduce hardships on permittees who previously obtained authorization under the NWP 21 issued on March 12, 2007, and invested substantial resources in reliance on that NWP authorization," while also protecting the aquatic environment.  We also agree with Riverkeeper that -- as the Corps concedes -- the Corps could not rely on economic considerations to issue a general permit that does not comply with the Clean Water Act's minimal impact requirements.

Nevertheless, Riverkeeper's argument is unpersuasive.  For starters, the Corps was not required to impose identical restrictions on applications under the two provisions of NWP 21.  The Clean Water Act requires only that the activities governed by a general permit are "similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only

32

minimal cumulative adverse effects on the environment."  33 U.S.C. § 1334(e)(1).

As we've explained already, there is nothing arbitrary or capricious about the

Corps' decision that activities under both NWP 21(a) and (b) will have minimal

individual and cumulative adverse impacts, and Riverkeeper does not contend that

the two groups of activities are insufficiently similar in nature to be encompassed

by a general permit.  Under arbitrary and capricious review, we may set aside the

Corps' decision "only for substantial procedural or substantive reasons as

mandated by statute"; we may not erect non-statutory dams to impede the Corps'

discretion.  Fund for Animals, 85 F.3d at 542 (emphasis added) (quoting N.

Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1539 (11th Cir. 1990)).  Nothing

in the CWA or NEPA precluded the Corps from relying on economic

considerations in choosing between alternatives that have minimal aquatic impacts

in order to ensure that mining companies were not unfairly burdened by the new

permit requirements.

Moreover, the Revised Decision Document evinces an additional, reasonable

basis for treating authorizations under 21(a) and (b) differently.  Paragraph (a) only

applies to a well-defined and limited subset of activities that can be reliably

verified to have minimal environmental impact.  At the time that it drafted the

2012 NWP 21, the Corps knew the entire universe of potential projects under 21(a)

because they had all already been operating for five years by that time, and,

33

notably, by the time that it drafted the Revised Decision Document, it had impact data for "all of the NWP 21(a) verifications that could be issued during the period [the 2012] NWP 21 is in effect." In contrast, for new projects under 21(b), the Corps had to rely on estimates of potential use over the five year term. In fact, the Revised Decision Document cited "the difficulty of documenting minimal adverse effect determinations for losses of aquatic resource area and functions that exceed those allowed in other NWPs" as a reason for moving away from preconstruction review and instead imposing strict caps on new projects. But that difficulty is substantially less relevant for grandfathered-in permits that had already been operating for years at the time that NWP 21 was issued. The Corps reasonably concluded that this subset of projects presents less of a risk of harm to the aquatic environment, while deciding to hold new -- and, therefore, more unpredictable -- projects to a different, and higher, standard.[7] We find that the Corps has provided a "satisfactory explanation for its action" based on its findings in the Revised Decision Document, so we will (as we must) defer to its decision. State Farm, 463 U.S. at 42-43.

---

    [7] As we noted earlier, in 2010, the Corps suspended the 2007 NWP 21 for mining activities in six Appalachian states. The Revised Decision Document provides that activities that were subject to the 2010 suspension may not apply for authorization under 21(a), and must either seek individual permits or fit within the 21(b) limits. This further supports the Corps' reasonable judgment to treat 21(a) and (b) activities differently, as 21(a) activities are already a less risky subset of the prior NWP 21 activities.

The long and short of it is, there was nothing arbitrary and capricious about the Corps' decision to treat old and new activities differently under the two provisions of this Nationwide Permit, or in its finding that the activities authorized under both provisions would result in minimal individual and cumulative impacts to the aquatic environment. Accordingly, we affirm the judgment of the district court granting final summary judgment to the Corps.

**AFFIRMED.**